14740649.1.22-120

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

BASHIRU GANIYU,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

---

Crim. No. 23-cr-00331 (LAK)

Civ. No. ______________

RECEIVED
SDNY PRO SE OFFICE
2026 SEP -1 AM 10:53

# MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

Bashiru Ganiyu, Pro Se
Reg. No. 69417-054
FCI Allenwood Low
P.O. Box 1000
White Deer, PA 17887

14740649.1.23-120

## INTRODUCTION

This case is one of several federal prosecutions arising from a single criminal enterprise based in Ghana that defrauded elderly Americans through romance and inheritance scams and moved the proceeds through United States bank accounts. The Government charged that enterprise not in one indictment but in a series of separate cases in this District. Petitioner Bashiru Ganiyu was prosecuted in this case, No. 23-cr-00331 (LAK), together with co-defendant Bissah. Other members of the same enterprise — Farouk Appiedu, Lord Aning, Fred Asante, and Celvin Freeman — were prosecuted together before Judge Rakoff in *United States v. Appiedu*, No. 21-cr-00088 (JSR). Still others were prosecuted in *United States v. Rufai*, No. 18-cr-00201 (DLC). The Government's own sentencing submissions describe all of these defendants as participants in the same "Enterprise."

Petitioner did not know any of them. He did not know Fred Asante. He did not know Celvin Freeman. He did not know Lord Aning or Farouk Appiedu. He did not know Samuel Boateng, the cooperating witness the Government called against him. And Boateng did not know him: asked directly, Boateng testified that he had never heard of Bashiru Ganiyu and had never heard of Gani, LLC. (Tr. 195.) Not one victim, not one co-defendant, and not one cooperating witness in any of these cases ever claimed to know Petitioner, to have met him, or to have spoken with him. He had no criminal history points. He was, in the Government's own words at trial, a "money washer."

The Government said so itself, repeatedly, under oath and on the record. In opening statement: the victims "didn't know the defendant. They didn't know his business. They sent the money because they were directed to by online scammers." (Tr. 42.) In summation: "the fraud

14740649.1.24-120

boys are the people behind the computers who are speaking to the victims. They are people telling the victims that they are in love with them or claiming to have an opportunity for the victims to make life-changing money." (Tr. 346.) And then: "The fraud boys instruct the victims to send money to the money washers. That's the defendant's job. Money washer or money launderer, same thing." (Tr. 347.) In rebuttal: "of course he didn't have to hide his identity because he didn't speak to the victims." (Tr. 373.) The Government's theory of this case, from first word to last, was that the romance fraud was committed by other people and that Petitioner's separate "job" was laundering.

That is precisely the theory a judge of this District accepted when sentencing Petitioner's similarly situated counterparts. Judge Rakoff presided over the sentencings of both Fred Asante and Celvin Freeman, and reached the same conclusion in each. Sentencing Fred Asante, Judge Rakoff pressed the Government on whether a launderer could be charged with knowledge of the romance aspect of the fraud. When the Government answered that romance scams were "endemic" to this type of operation, the Court rejected it: "I'm not sure what you mean by 'endemic' . . . . I don't think — at least I don't know that one could say with any assurance that someone who launders money from fraud but is not himself involved in the fraudulent communications knows that it's a romance fraud because that's 'endemic.' That sounds too vague to me." (*Asante* Sent. Tr. 14.) The Court found that Asante "knew that these people were sending him money, but he didn't know why they were sending him money" (*id.* at 13), and concluded: "I don't think there is evidence that he knew about the romance emotional aspects of the fraud . . . . I'm not going to attribute that to him." (*Id.* at 15, 21.)

Sentencing Celvin Freeman, Judge Rakoff reached the same conclusion after a trial: "I also am persuaded that there was not enough evidence, either at trial or before the Court now, to

14740649.1.25-120

conclude that this defendant had more than, at best, a very generalized knowledge of what was going on in those situations. That wasn't his role. His role was money laundering. His role was figuring out ways to facilitate the fraud economically . . . but I don't think he fully, in that sense, recognized the emotional harm that the fraud perpetrated." (*Freeman* Sent. Tr. 26.) The Court credited defense counsel's argument that "Mr. Freeman was very far removed from initiating it, thinking about it, and picking up the phone and trying to get someone to give money." (*Id.* at 7.)

Neither Asante nor Freeman received a vulnerable-victim adjustment under U.S.S.G. § 3A1.1(b). Neither received a substantial-financial-hardship enhancement under § 2B1.1(b)(2). Petitioner — the least culpable of the three, with no criminal history, no victim contact, and no connection to any co-conspirator — received both. He is the only launderer in this enterprise ever to receive either one.

The difference was not the facts. The difference was counsel. Asante's counsel and Freeman's counsel each objected to the loss calculation, each separated the romance fraud from the laundering, and each forced the Government to prove what it had actually traced. Freeman's counsel went line by line through the bank records and produced a table of $1,179,966 in funds "obtained under false pretenses" — a figure the Court substantially adopted. Petitioner's counsel objected to nothing. Asked at sentencing whether there were "any unresolved objections to the PSR that are material," she answered: "No, your Honor." (Sent. Tr. 2.)

The consequences are stark and are set out in detail in Part I.E below. Fred Asante — whom the Government called "by far the most culpable defendant of anyone who has been charged in this case or any related cases," who had a "substantial criminal history" in Criminal History Category III, who spent "almost half" of his twenty-five years in this country "either

14740649.1.26-120

committing serious federal crimes or serving time in prison," who laundered approximately $36 million through nineteen bank accounts over five years, and whom Judge Rakoff found "hadn't learned his lesson" — received 108 months. Celvin Freeman, "one of the top U.S.-based money launderers for the Enterprise" and "one of the most culpable defendants to be sentenced," who was convicted at trial on all seven counts, and of whom the Court said that "under oath, he just told one lie after another" and that he "was busy lying on the stand" (*Freeman* Sent. Tr. 26), received 78 months — later reduced to 63 months. The Government asked for 120 months for Asante and 120 months for Petitioner. Petitioner received 156 months.

Petitioner's sentence is one and a half times that of the most culpable defendant in the entire enterprise and two and a half times that of a co-launderer whom the sentencing court found to have lied repeatedly under oath and who was convicted on nearly twice as many counts. The sole variable that explains the difference is the constitutional adequacy of counsel. That is the subject of this motion.

## PART I. STATEMENT OF THE CASE

### A. The Charges and the Enterprise Prosecutions

On June 26, 2023, a grand jury in this District returned an indictment against Petitioner. A superseding indictment, S1 23 Cr. 331 (LAK), was filed March 14, 2024, charging four counts: Count One, conspiracy to commit wire fraud and mail fraud, 18 U.S.C. § 1349; Count Two, money laundering conspiracy, 18 U.S.C. § 1956(h), with the object being concealment laundering under § 1956(a)(1)(B)(i); Count Three, conspiracy to receive stolen money, 18 U.S.C. § 371, with the object offense being 18 U.S.C. § 2315; and Count Four, receipt of stolen money, 18 U.S.C. §§ 2315 and 2. The charged period ran from January 2020 through June 2022.

14740649.1.27-120

The Government's theory was that a criminal enterprise based in Ghana — which the Government capitalized and referred to throughout its filings as "the Enterprise" — operated romance, inheritance, business-email-compromise, and COVID-relief frauds against Americans, and that United States–based launderers received and forwarded the proceeds. The Government charged the members of that single enterprise in separate cases before different judges of this Court.

In *United States v. Appiedu*, No. 21-cr-00088 (JSR), the Government charged four defendants together: Farouk Appiedu (Defendant 1), Fred Asante (Defendant 2), Celvin Freeman (Defendant 3), and Lord Aning. The counts in that case mirror the counts here almost exactly — 18 U.S.C. § 1349 (conspiracy to commit wire fraud), § 1343 (wire fraud), § 1956 (money laundering conspiracy), § 371 (conspiracy to receive stolen money), and § 2315 (receipt of stolen money). Lord Aning was sentenced on February 28, 2022 to 24 months and restitution of $1,704,408.52. Fred Asante was sentenced on May 18, 2022 to 108 months and restitution of $2,292,486.71. Celvin Freeman was convicted at trial on all seven counts on March 30, 2022 and sentenced on October 20, 2022 to 78 months, reduced on May 1, 2024 to 63 months. In *United States v. Rufai*, No. 18-cr-00201 (DLC), the Government charged still other launderers connected to the same Enterprise, obtaining sentences of 70, 51, 48, and 30 months.

Every one of those defendants was sentenced *before* Petitioner. Every one of those dockets, sentencing submissions, and transcripts was publicly available to Petitioner's counsel at the time she prepared his sentencing submission in November 2024. As set out in Ground Eleven, she consulted none of them.

The indictment did not allege — and the Government never contended — that Petitioner

14740649.1.28-120

devised the fraudulent schemes, contacted any victim, made any misrepresentation to any victim, or transmitted any wire or mailing to any victim in furtherance of the fraud. The allegation was, from beginning to end, that Petitioner *received* money that others had already fraudulently obtained.

**B. The Rejected Plea Offer**

On the morning of jury selection, April 16, 2024, the Court asked the Government to make a record on plea offers. AUSA Kudla stated: "[T]he plea was offered to the defendant on December 28, 2023, which was to a one-count substantive count of receipt of stolen property in violation of 18 U.S.C. 2315. That count carried a ten-year maximum with a guideline range of 46 to 57 months. That plea expired on January 9, 2024." (Apr. 16, 2024 Tr. 2.) The Court then asked Petitioner directly whether the offer had been extended to him and whether he "in fact ha[d] advice of counsel and then reject[ed] it." Petitioner answered "Yes, sir" to both. (*Id.* at 3.)

**C. The Trial and the Trial Evidence**

Trial began April 16, 2024 and concluded with a verdict on April 23, 2024. The Government called approximately a dozen witnesses. The defense called none and Petitioner did not testify. The defense conceded that the underlying romance frauds occurred and that the victims lost money; the sole contested issue was Petitioner's knowledge and intent. The evidence was as follows.

***1. The victim witnesses: no contact with Petitioner***

**Dennis Powell**, the Government's first witness, was a romance-scam victim who met "Valerie Myers" on Senior FriendFinder. (Tr. 28-29.) Myers told him she was expecting an inheritance of approximately £18 million. (Tr. 31.) Powell sent a total of $1.4 million. (Tr. 33.)

14740649.1.29-120

He was instructed by telephone to send money to Gani, LLC by someone calling himself "Barrister Trent." (Tr. 33-36.) Powell testified that he had **no interactions with Mr. Ganiyu at all.** (Tr. 43.)

**James R. Von Allmen** met "Joyce Tyre" on a dating website and sent in excess of $600,000, some to Gani, LLC. (Tr. 199, 202, 215.) He was directed to send funds by a third party, Mark Hayford. (Tr. 214.) He **never interacted with anyone from Gani, LLC.** (Tr. 216.)

**Paul Anthony Gruszecki** met "Esther Opoku" on a dating website in late 2019 and sent approximately $805,000, including funds to Gani, LLC. (Tr. 248-49, 257.) He spoke with Ms. Adams of TD Bank about halted wires. (Tr. 259-61.) **At no time did Mr. Gruszecki speak with Mr. Ganiyu.** (Tr. 265.)

**Charles Kenneth Lee Jones** met "Florence Pryor" on Christian Mingle and sent money to Gani, LLC. (Tr. 304-06.) He **never spoke with anyone from Gani, LLC.** (Tr. 310.)

Every victim who testified was defrauded by someone else, was directed to Petitioner's account by someone else, and had no dealing of any kind with Petitioner. No victim testified to knowing him, hearing from him, or being contacted by him.

***2. The border search and the Powell check photograph***

HSI Special Agent Timothy McCann testified that he met Petitioner at John F. Kennedy International Airport on August 16, 2021, upon his return from Accra, Ghana. (Tr. 44-45.) Petitioner told McCann that he exported items to Ghana, including perfume, oil, rice, and automobiles, and that his company was Gani, LLC. (Tr. 46.) Petitioner was cooperative and provided the passcodes to his electronic devices. (Tr. 48.) He had "two cell phones and one tablet" — one in a red case, one in a bluish-green case. (Tr. 47-48.) The agents "manually

14740649.1.30-120

review[ed] these cell phones," meaning they "scrolled through various folders, like photographs and chats." (Tr. 48.) No warrant was sought or obtained.

From that search the Government introduced Government Exhibit 401, a photograph of a Chase cashier's check; Government Exhibit 402, a photograph of a FedEx envelope bearing "Dennis Powell" as origin ID; and Government Exhibit 408, a photograph of the red phone displaying Gani, LLC, the cashtag $GaniLLC, and ganitruck@ganillc.com. (Tr. 48-51.) Counsel stated "No objection" to each. The Powell check was the $200,000 instrument pleaded as the sole overt act in Count Three.

The search also generated probable cause for the September 20, 2021 warrant for the ganitruck@ganillc.com Google account, which averred that "GANIYU has stored a communication that appears to be about money laundering in the Red iPhone 11." Counsel never moved to suppress the search or anything derived from it.

*3. The remaining Government witnesses*

Task Force Officer **Jose Cubria** of CBP recounted the number of times Petitioner traveled to and from Ghana. (Tr. 53-56.) FBI financial analyst **Jeffrey Cumberbatch** testified at length about Petitioner's fifteen bank accounts, and confirmed that **each account was opened using Petitioner's own name and contact information**. (Tr. 59-60, 110.) **Stanley Fung Lau**, a relationship banker at East West Bank, testified about the Gani, LLC account and acknowledged that he did not contact the source of the wires that concerned him. (Tr. 112-13, 123.) **Tara Adams**, Senior Investigator at TD Bank, testified that TD froze the account, and that Petitioner then **requested that TD reverse the wire transfers**. (Tr. 218-19, 240, 247.) **Special Agent Hannah Beller** testified that she examined a single image of an email found on Mr. Gruszecki's phone.

14740649.1.31-120

(Tr. 268.)

*4. The cooperating witness*

**Samuel Boateng** testified pursuant to a cooperation agreement after pleading guilty to conspiracy to commit wire fraud, wire fraud, conspiracy to commit money laundering, conspiracy to receive stolen property, and conspiracy to receive stolen money. (Tr. 134, 189.) He described a Ghana-based enterprise moving on the order of $100 to $150 million over roughly nine years across some 3,000 transactions, approximately 85 percent of it romance fraud. He described the "Fraud Boys" who executed the frauds: they "meet them online on the dating apps"; they "talked to them for several hours to gain their trust and affection"; and the purpose was "[t]o extract and trick and take monies from them." (Tr. 133-35.) He described adding "one-hop money washers" to the network. (Tr. 195.)

And then, despite his intimate involvement in these frauds, Boateng testified that **he had no knowledge of Mr. Ganiyu.** (Tr. 195.) He had never heard of Bashiru Ganiyu. He had never heard of Gani, LLC. He had never dealt with him. No witness ever connected the two.

Earlier in Boateng's direct, the Government offered statements attributed to Fred Asante. Counsel objected. The Court admitted them "subject to connection" under Federal Rule of Evidence 801(d)(2)(E). (Tr. 184-85.) The Government never returned to make the connection; counsel never asked the Court to make the required finding; and counsel never moved to strike.

*5. Rule 29 and the charge*

At the close of the evidence, counsel moved for a judgment of acquittal in a single sentence: "At this point defense requests a verdict of not guilty due to the fact the government has failed to meet its burden." The Court asked: "In any particular respect?" Counsel answered:

14740649.1.32-120

"It failed to prove the case beyond a reasonable doubt." The Court then asked: "Have you fully stated the grounds you wish to advance?" Counsel answered: "Yes, your Honor." The Court denied the motion and added, "You know why I put you on the spot." Counsel replied, "I do. I do, your Honor." (Tr. 315.)

No multiple-conspiracies instruction was requested or given. The jury convicted on all four counts.

**D. The Post-Trial Motion**

Counsel moved under Rules 29 and 33 (Dkt. 76). On May 9, 2024, the Court denied the motion in a three-page memorandum and order (Dkt. 77). Paraphrasing the Government's rebuttal summation, the Court observed that Petitioner "opened ten different business bank accounts for a business that" did not "exist, received millions of dollars from individuals" unknown to him from "across the United States," and sent that money out the door within days, often abroad, in exchange for hundreds of thousands of dollars. The Court held there was "no substantial basis for the contention that the evidence was insufficient to justify conviction."

**E. Sentencing Disparity**

Because the Government charged a single enterprise in multiple separate cases, the disparity among its members is measurable with unusual precision. The Government filed sentencing submissions in each case describing each defendant's role in the same operation. Those submissions, and the sentencing transcripts, establish the following.

***1. Fred Asante — the most culpable defendant in the enterprise***

In its sentencing submission in *United States v. Asante*, No. 21-cr-00088 (JSR), Dkt. 111, the Government described Asante as "the top U.S.-based money launderer for a criminal

14740649.1.33-120

enterprise (the 'Enterprise') based in West Africa." (Gov't Asante Mem. 2.) It stated that "[t]he defendant served an integral role in the conspiracy, as the Enterprise needed U.S.-based bank accounts to receive and launder fraud proceeds from victims in order to avoid arousing suspicion." (*Id.*) It described him as "a key member and leader of the U.S.-based money laundering operation for the Enterprise." (*Id.* at 5.) And it stated flatly: "In terms of relative culpability, Asante is **by far the most culpable defendant of anyone who has been charged in this case or any related cases.**" (*Id.* at 6 (emphasis added).)

The scale was enormous. Asante "opened and maintained a staggering 19 bank accounts at more than 10 different banks," over "approximately five years," laundering "at least approximately $6.7 million in identified fraud proceeds from more than 80 victims," against total deposits of "approximately $36 million." (*Id.* at 3-5, 7.) His criminal history was extensive: a prior federal narcotics conviction for which he received an 87-month sentence, compounded by flight to Ghana on the eve of trial, continued heroin shipments from abroad, and a failure-to-appear charge. (*Id.* at 6-7.) The Government emphasized that "for the past 25 years that the defendant has been in the United States, he spent **almost half of that time either committing serious federal crimes or serving time in prison,**" and that he had "substantial criminal history." (*Id.* at 7 (emphasis added).) He was in Criminal History Category III.

At sentencing, Judge Rakoff summarized: "according to the government, he was the single top money launderer among the defendants in this case for over a period of about five years involving something like 19 different bank accounts. Second and in very much contrast to the other defendant that I've so far sentenced in this matter, he had a substantial prior conviction. . . . But then he went and spent **five years doing** this money laundering in what was a despicable scheme that harmed the victims immeasurably. So he clearly **hadn't learned his lesson.**" (*Asante*

14740649.1.34-120

Sent. Tr. 3-4 (emphases added).) The Court noted that Asante had been "legitimately making $60,000 to $70,000 a year. So he wasn't exactly indigent." (*Id.* at 9.) The Court called him "a master at money laundering." (*Id.* at 21.)

Asante's Guidelines were offense level 30, Criminal History Category III, range 121-151 months. **He received no vulnerable-victim adjustment. He received no substantial-financial-hardship enhancement.** The Government requested 120 months. Judge Rakoff imposed **108 months** — twelve months below the Government's own request.

*2. Celvin Freeman — convicted at trial on seven counts, found to have lied under oath, no enhancements*

Celvin Freeman was tried before Judge Rakoff and convicted on **all seven counts** — conspiracy to commit wire fraud, wire fraud, money laundering, conspiracy to receive stolen money, receipt of stolen money, conspiracy to operate an unlicensed money transmitting business, and operation of that business. The Government described him as **"one of the top U.S.-based money launderers for the Enterprise"** (Gov't Freeman Mem., Dkt. 126, at 24) and, "[i]n terms of relative culpability," as **"one of the most culpable defendants to be sentenced"** (*id.* at 29).

Freeman testified at trial, and the sentencing court found in plain terms that he had lied. Judge Rakoff, addressing his allocution, said: "As I was listening to the defendant right now in what was, on its face, a very eloquent statement, I couldn't help but remember how, **under oath, he just told one lie after another.** . . . That was not the position he took when he was **busy lying on the stand.**" (*Freeman* Sent. Tr. 26 (emphases added).) Freeman received no acceptance-of-responsibility reduction.

And yet — this is the single most important fact in this motion — **the Government itself**

14740649.1.35-120

**calculated Freeman's Guidelines under U.S.S.G. § 2S1.1(a)(2)**, the third-party money launderer provision, with a base offense level of **eight**. (Dkt. 126 at 11 ("Pursuant to U.S.S.G. § 2S1.1(a)(2), the base offense level is eight.").) The Probation Office agreed. (PSR ¶¶ 56-71.) The Government then applied the § 2B1.1 table not to gross deposits but to the value of funds actually traced: "because the value of the laundered funds was more than $1,500,000 but less than $3,500,000, the offense level is increased by 16 levels." (*Id.*) Freeman's accounts had received "deposits totaling approximately $5.8 million dollars"; the Government used the **traced** figure of approximately $2.5 million, not the gross. (*Id.* at 13; Dkt. 125 at 3.)

**Freeman received no vulnerable-victim adjustment. He received no substantial-financial-hardship enhancement.** The Government sought a two-level obstruction enhancement under § 3C1.1 on the basis of Freeman's perjury, and the Probation Office deferred to the Court. Judge Rakoff agreed that Freeman had lied but declined to apply the enhancement as a matter of principle: "I never add two points for perjury when taking the stand because I think that particular guideline is fundamentally flawed . . . . [I]t discourages defendants from exercising their right to take the stand, because what it says is if you take the stand and you are convicted, even though we have no idea whether the jury found you had committed perjury, let alone perjury beyond a reasonable doubt, a judge, by a mere preponderance of the evidence, can determine you committed perjury and then enhance your guideline range, and that, in my view, borders on the unconstitutional." (*Freeman* Sent. Tr. 3.) **His offense level was accordingly 28, Criminal History Category I, yielding 78 to 97 months. Judge Rakoff imposed 78 months, later reduced to 63 months.**

Freeman's counsel then moved under Amendment 821 for the zero-point-offender reduction of U.S.S.G. § 4C1.1, arguing that "[i]t is undisputed that Mr. Freeman did not pose as

14740649.1.36-120

any of the romantic partners or business associates of any of the scammed individuals," that the victim witnesses "had no direct nor personal connection to Mr. Freeman," and that "Mr. Freeman did not personally cause substantial financial hardship to any of the victims." (Dkt. 147 at 2, 4.) **The Government did not dispute any of it.** It responded that "the defendant's motion should be granted" and that it "does not object to the Court granting the defendant's motion." (Dkt. 151 at 1, 3.) On May 1, 2024, the Court reduced Freeman's sentence to **63 months**. (Dkt. 155.)

Freeman's counsel also argued that his client's certain removal from the United States warranted a shorter sentence, invoking controlling Second Circuit authority: "The Second Circuit has held that when 'determining what sentence is sufficient, but not greater than necessary, to serve the needs of justice, a district court may consider the uncertainties presented by the prospect of deportation proceedings and the impact deportation will have on the defendant and his family.'" (Dkt. 125 at 1-2 (quoting *United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014)).) She argued that because deportation was certain regardless of sentence, "any amount of time served in prison . . . would not serve any useful purpose," and that a sentence of imprisonment "would merely run up the costs to the American taxpayer." (*Id.* at 2.) Petitioner's counsel made no comparable argument, though Petitioner — a lawful permanent resident with United States citizen children — had far stronger ties to this country than Freeman, who was unlawfully present and "prepared for the fact of deportation." (*Id.* at 5.)

***3. Petitioner***

Petitioner had no criminal history points. He never contacted a victim. He never met a co-conspirator. He opened his accounts in his own name with his own contact information. (Tr. 110.) The Government requested 120 months — the same figure it requested for Asante. The Court imposed **156 months**.

14740649.1.37-120

### *4. The comparison*

The following table compares the three launderers on the Government's own descriptions and the courts' own findings.

| | **Fred Asante 21-cr-88 (JSR)** | **Celvin Freeman 21-cr-88 (JSR)** | **Bashiru Ganiyu 23-cr-331 (LAK)** |
|---|---|---|---|
| **Government's description** | "By far the most culpable defendant of anyone... charged in this case or any related cases"; "integral role"; "leader"; "top U.S.-based money launderer" | "One of the top U.S.-based money launderers for the Enterprise"; "one of the most culpable defendants to be sentenced" | "Money washer"; victims "didn't know the defendant" |
| **Resolution** | Guilty plea (§ 1956(h)) | Trial — guilty on all 7 counts | Trial — guilty on all 4 counts |
| **Criminal history** | Category III; prior 87-month federal narcotics sentence; fled on eve of trial | Category I | Category I; zero points |
| **Total deposits** | ~$36 million | ~$5.8 million | ~$11.7 million |
| **Traced fraud proceeds** | ~$6.7 million (80+ victims) | ~$2.5 million (97 victims) | $7,675,785.32 (40+ victims) |
| **Loss figure used** | Traced | Traced | Gross deposits |
| **Bank accounts** | 19 accounts, 10+ banks, 5 years | 8 accounts | 10-15 accounts |
| **§ 2S1.1 subsection** | (a)(2) — third-party | (a)(2) — third-party | (a)(1) — direct |
| **Vulnerable victim (§ 3A1.1)** | NO | NO | YES (+2) |
| **Substantial hardship (§ 2B1.1(b)(2))** | NO | NO | YES (+4) |
| **Obstruction / perjury** | No | NO | No |
| **Offense level / range** | 30 / 121-151 months | 28 / 78-97 months | 37 / 210-262 months |
| **Government request** | 120 months | Guidelines sentence | 120 months |
| **SENTENCE IMPOSED** | **108 months** | **78 months, reduced to 63 months** | **156 months** |

The arithmetic is inescapable. Petitioner's 156-month sentence is **1.44 times** the 108 months imposed on the defendant the Government called "by far the most culpable defendant of anyone who has been charged in this case or any related cases," and **2.48 times** the 63 months ultimately imposed on a co-launderer convicted at trial on seven counts whom the sentencing

court found to have lied repeatedly under oath. Petitioner is the only one of the three sentenced under § 2S1.1(a)(1) rather than (a)(2). He is the only one of the three whose loss figure was gross deposits rather than traced proceeds. And he is the only one of the three to receive a vulnerable-victim adjustment or a substantial-financial-hardship enhancement.

The cascading effect of counsel's failures is quantifiable. Under § 2S1.1(a)(2) the base offense level goes from 7 to 8 but the § 2B1.1 specific offense characteristics fall away: the four-level substantial-hardship enhancement and the two-level foreign-scheme enhancement are unavailable, a net reduction of **six levels**. Confining loss to traced proceeds rather than gross deposits, as the Government did for both Asante and Freeman, removes at least **two more**. Removing the vulnerable-victim adjustment that neither Asante nor Freeman received removes **two more**. Eight levels. From offense level 37 — 210 to 262 months — to offense level 29 or below.

And there is a further, compounding injury. Because § 4C1.1(a)(9) disqualifies any defendant who "receive[d] an adjustment under § 3A1.1," and § 4C1.1(a)(6) disqualifies any defendant who "personally cause[d] substantial financial hardship," the two enhancements counsel failed to contest have also rendered Petitioner **categorically ineligible** for the two-level zero-point-offender reduction that Freeman received — the very reduction that took Freeman from 78 months to 63. Petitioner — who, like Freeman, has no criminal history, and who, unlike Freeman, was never found to have lied under oath — is barred from a benefit Freeman obtained precisely because Freeman's counsel made the objections Petitioner's counsel did not.

With that reduction, and with the corrected calculations set out in Grounds Six through Ten, Petitioner's offense level would have been **24** at Criminal History Category I — a

14740649.1.39-120

Guidelines range of **51 to 63 months**. That is the range that would have applied had Petitioner received the same treatment the Government itself afforded Freeman. Petitioner received 156 months.

**F. The Government Was Collaterally and Judicially Estopped From Arguing That the Vulnerability and Hardship Enhancements Applied**

The positions the Government advanced at Petitioner's sentencing are irreconcilable with the positions it took, and the findings it accepted, in the related prosecutions of the same enterprise.

In *Freeman*, the Government litigated and lost the question whether a launderer removed from victim contact can be charged with knowledge of the romance aspect of the fraud. Judge Rakoff asked the Government directly what Freeman "knew about the fraudulent romancing," observing that "to me, that is the worst part of this scheme," and adding: "It's not an element of the crime, but **it's an element of the sentence**." (*Freeman* Sent. Tr. 9 (emphasis added).) After hearing the Government's answer, the Court found: "I also am persuaded that there was not enough evidence, either at trial or before the Court now, to conclude that this defendant had more than, at best, a very generalized knowledge of what was going on in those situations. That wasn't his role. His role was money laundering. His role was figuring out ways to facilitate the fraud economically and it involved his own lies, as well, **but I don't think he fully, in that sense, recognized the emotional harm that the fraud perpetrated**." (*Id.* at 26 (emphasis added).)

In *Asante*, the Government advanced the identical theory and the same Court rejected it in terms. When the Government argued that romance scams were "endemic" to this type of operation and therefore known to launderers, the Court responded: "That's what I want to press

14740649.1.40-120

you on. I'm not sure what you mean by 'endemic' . . . . I don't think — at least I don't know that one could say with any assurance that someone who launders money from fraud but is not himself involved in the fraudulent communications knows that it's a romance fraud because that's 'endemic.' That sounds too vague to me." (*Asante* Sent. Tr. 14.) The Government conceded: "[T]his defendant was not the one behind the computer directly communicating and defrauding the victims," and "I don't think we have specific evidence that he knew of the financial destruction that was caused to these people." (*Id.* at 13-14.) The Court concluded: "He knew that these people were sending him money, but he didn't know why they were sending him money, other than they were being misled into sending him money" (*id.* at 13), and "I don't think there is evidence that he knew about the romance emotional aspects of the fraud that may be relevant in other cases in other sentences but not in this one" (*id.* at 21). The Court declined to "attribute that to him" or "add that as a factor." (*Id.* at 15.)

The trial record here places Petitioner in an identical — indeed weaker — position than Asante and Freeman. Boateng testified that it was the "Fraud Boys" who "communicated directly with the victims," who "talked to them for several hours to gain their trust and affection," and whose object was "[t]o extract and trick and take monies from them." (Tr. 133-35.) The Government told the jury the same thing in summation: the fraud boys "are the people behind the computers who are speaking to the victims," and "[t]he fraud boys instruct the victims to send money to the money washers. **That's the defendant's job.**" (Tr. 346-47.) Unlike Asante, Petitioner had no prior conviction. Unlike Asante, no evidence showed Petitioner was sent victims' driver's licenses or advised co-conspirators on how to coach victims through bank inquiries. Unlike Freeman, Petitioner did not testify falsely.

Judicial estoppel prevents a party from "assert[ing] a position in a legal proceeding

14740649.1.41-120

contrary to a position previously taken in the same or a related proceeding," where the party "succeeded in persuading a court to accept that party's earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001). Petitioner recognizes that the doctrine's application to the Government in criminal cases is not settled in this Circuit, and he does not rest this motion on estoppel as an independent ground. He advances it for two narrower and well-supported purposes.

*First*, as evidence bearing on *Strickland*'s prejudice prong. The question under Ground Nine is whether there is a reasonable probability that a properly counseled objection to the vulnerable-victim and hardship enhancements would have succeeded. The answer is supplied by the record: when counsel in the related cases made those very arguments, on materially identical facts, they succeeded — twice, before the same court, and in Freeman's case with the Government's express non-opposition. That is not speculation about a counterfactual. It is documented history.

*Second*, as a matter of the Government's duty of candor. The Government prosecuted Asante, Freeman, and Petitioner. The same United States Attorney's Office filed all three sentencing submissions. It knew that Judge Rakoff had twice declined to attribute romance-fraud knowledge to a launderer, and it knew that neither Asante nor Freeman had received a vulnerable -victim or hardship enhancement. It disclosed none of this to Judge Kaplan. It instead urged enhancements premised on Petitioner's supposed awareness of victim characteristics while omitting that a judge of the same court had twice rejected the identical theory as to more culpable defendants in the same enterprise. Counsel's failure to bring those adverse rulings to this Court's attention — when they were a matter of public record on a docket she had every reason to consult — is the deficiency alleged in Grounds Nine and Eleven.

14740649.1.42-120

### G. The Direct Appeal

New counsel, appointed under the Criminal Justice Act, filed an appeal raising a single issue: the admission under Rule 404(b) of evidence concerning a 2015 bail proceeding. On May 13, 2026, the Second Circuit affirmed by summary order, holding the evidence properly admitted for knowledge and absence of mistake, rejecting a Rule 106 completeness argument in footnote 2, and holding in footnote 3 that any challenge to the limiting instruction was waived as invited error because the instruction had been jointly proposed. Appellate counsel did not raise the sufficiency of the evidence on any count. No petition for certiorari was filed.

No claim of ineffective assistance was raised on direct appeal. Petitioner's conviction became final for purposes of § 2255(f)(1) upon expiration of the 90-day certiorari period, on or about August 11, 2026. *Clay v. United States*, 537 U.S. 522, 527 (2003). This motion is timely.

## PART II. APPLICABLE LEGAL STANDARDS

### A. The Strickland Framework

To prevail on a claim of ineffective assistance, a petitioner must show (1) that counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome" — a standard materially less demanding than more-likely-than-not. *Id.* at 694; *Gonzalez v. United States*, 722 F.3d 118, 135 (2d Cir. 2013) ("'reasonable probability' is a less demanding standard than 'more likely than not'").

Judicial scrutiny of counsel's performance is deferential, and courts presume that

14740649.1.43-120

challenged conduct reflects sound strategy. *Strickland*, 466 U.S. at 689. But that presumption protects *informed* strategic choices. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. Where counsel has not researched an available legal argument at all, there is no strategy to which deference is owed. *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003); *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001); *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001).

**B. Ineffective Assistance at Sentencing: *Glover* and *Molina-Martinez***

The Sixth Amendment applies with full force at sentencing. *Lafler v. Cooper*, 566 U.S. 156, 165 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001). *Glover* is dispositive of the prejudice inquiry for Grounds Six through Eleven. There, the Government argued that a Guidelines error producing only six to twenty-one additional months was too insignificant to constitute prejudice. The Supreme Court rejected that argument: "Authority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance." *Id.* at 203.

*Molina-Martinez v. United States*, 578 U.S. 189 (2016), supplies the causal link. The Guidelines are "the lodestar" and "the starting point and the initial benchmark" of every federal sentencing, *id.* at 198-99, and "[w]hen a defendant is sentenced under an incorrect Guidelines range — whether or not the defendant's ultimate sentence falls within the correct range — the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Id.* at 198. That holds even where the court varies from the range, because the range still anchors the analysis. *Id.* at 200.

14740649.1.44-120

That reasoning has particular force here. This Court expressly characterized the 156-month sentence as "a substantial downward variance from the guidelines" (Sent. Tr. 10) — that is, it reasoned *from* the 210-262 range. Had the range been correctly calculated at 51 to 63 months, a "substantial downward variance" from that range would necessarily have produced a dramatically shorter sentence. The sentence imposed exceeds the top of the correct range by more than seven years.

**C. Ineffective Assistance of Appellate Counsel**

The *Strickland* standard applies to appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Appellate counsel need not raise every colorable claim, *Jones v. Barnes*, 463 U.S. 745, 754 (1983), but the Second Circuit has repeatedly held that a petitioner establishes deficient performance where counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). "[A] petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues." *Id.* Prejudice requires a reasonable probability that, but for the omission, the appeal would have succeeded. *Id.* at 534.

This Circuit has granted relief on precisely this footing. In *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000), the court held appellate counsel ineffective for omitting a clearly stronger claim in favor of weaker ones. In *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015), the court found deficient performance where appellate counsel failed to raise a meritorious claim apparent on the face of the record. And in *Ramchair v. Conway*, 601 F.3d 66, 73-75 (2d Cir. 2010), the court affirmed relief where appellate counsel failed to raise the one issue that had been fully preserved and was likely to prevail. *See also Sellan v. Kuhlman*, 261 F.3d 303, 317 (2d Cir.

14740649.1.45-120

2001).

A sufficiency-of-the-evidence claim is the paradigmatic "significant and obvious" issue. It is preserved by any Rule 29 motion; it requires no extra-record development; it is apparent from the trial transcript; and it carries the greatest possible remedy — a judgment of acquittal and the bar of the Double Jeopardy Clause, *Burks v. United States*, 437 U.S. 1, 18 (1978). Where the trial record shows that the Government's own cooperating witness had never heard of the defendant, that no victim or co-conspirator ever claimed to know him, and that the district court denied a Rule 33 motion without addressing the agreement element, appellate counsel's decision to omit sufficiency and raise only a discretionary evidentiary ruling reviewed for abuse of discretion is not a strategic choice entitled to deference. It is the omission of the strongest available claim in favor of a weaker one. Ground One, *infra*, develops this argument.

**D. Procedural Default and the Mandate Rule**

Claims that could have been raised on direct appeal but were not are ordinarily procedurally defaulted, and may be raised on collateral review only upon a showing of cause and actual prejudice, or actual innocence. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *United States v. Frady*, 456 U.S. 152, 167-68 (1982). Constitutionally ineffective assistance constitutes cause. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

That doctrine poses no obstacle here, because every ground in this motion is pleaded as ineffective assistance, and *Massaro v. United States*, 538 U.S. 500, 504 (2003), holds that ineffective-assistance claims are exempt from the procedural-default rule altogether. Petitioner presents no freestanding claim of trial error, Guidelines error, or Fourth Amendment violation; each is framed as a Sixth Amendment failure of counsel. *See Kimmelman v. Morrison*, 477 U.S.

14740649.1.46-120

365, 382-83 (1986).

Petitioner also observes the mandate rule. Under *Yick Man Mui v. United States*, 614 F.3d 50, 53-55 (2d Cir. 2010), claims resting on factual predicates already raised and decided on direct appeal are barred. Petitioner therefore does not relitigate the Rule 404(b) ruling the Second Circuit decided. No ground in this motion asks this Court to revisit it.

Finally, a freestanding Guidelines miscalculation is generally not cognizable under § 2255. *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996). That is why Grounds Seven through Twelve are framed as ineffective assistance, where such claims are cognizable and where *Glover* governs prejudice.

**E. Cumulative Prejudice**

Where counsel commits multiple errors, prejudice is assessed in the aggregate rather than error by error. *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) ("the combined weight" of counsel's errors required relief although "each alone might not"); *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991). Part IV, *infra*, applies this principle.

## PART III. GROUNDS FOR RELIEF

## GROUND ONE: APPELLATE COUNSEL WAS INEFFECTIVE IN FAILING TO ARGUE THAT THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH ANY CONSPIRACY

### A. The Omitted Claim

Appellate counsel raised one issue: a Rule 404(b) evidentiary ruling reviewed for abuse of discretion. He did not raise the sufficiency of the evidence on Counts One, Two, or Three — three conspiracy counts on which the Government's own cooperating witness testified he had

14740649.1.47-120

never heard of the defendant. Under the standard set out in Part II.C, *supra*, that is the omission of a "significant and obvious" issue in favor of a "clearly and significantly weaker" one. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

**B. Conspiracy Requires Proof of an Agreement, Not Suspicious Conduct**

"[T]he gist of the offense remains the agreement." *Borelli*, 336 F.2d at 384. A conspiracy requires at least two persons who have agreed; a defendant cannot conspire with himself. To sustain a conviction the Government must prove that the defendant "knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989).

*Nusraty* is directly applicable. The Second Circuit reversed conspiracy, importation, and possession convictions for insufficient evidence, holding at 764 that "[m]ere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement," and that "[s]uspicious circumstances . . . are not enough to sustain a conviction for conspiracy." The court emphasized that the evidence there "was at least as consistent with innocence as with guilt."

*United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001), is closer still. Samaria transported boxes of goods purchased with stolen credit-card information and received payment for doing so. The Second Circuit reversed his conspiracy and substantive convictions, holding the evidence insufficient to establish that he knew the *specific* nature of the criminal scheme. Suspicious circumstances surrounding a courier's participation — including that he was paid and that the goods were obviously irregular — did not permit a rational jury to find knowing membership in the charged conspiracy beyond a reasonable doubt. *Id.* at 233-40.

14740649.1.48-120

This Circuit has applied that principle repeatedly. In *United States v. Lorenzo*, 534 F.3d 153, 159-61 (2d Cir. 2008), the court reversed where the defendant transported a courier, paid for lodging, and concealed cash, because the Government failed to prove he knew the suitcase contained narcotics. In *United States v. Torres*, 604 F.3d 58, 66 (2d Cir. 2010), the court held: "Proof that the defendant engaged in suspicious behavior, without proof that he had knowledge that his conduct involved narcotics, is not enough." *See also United States v. Gaviria*, 740 F.2d 174, 183-84 (2d Cir. 1984).

Most recently, in *United States v. Belloisi*, No. 24-2614 (2d Cir. Jan. 16, 2026), the Second Circuit reversed and remanded for entry of a judgment of acquittal where the defendant, an airport mechanic, approached an aircraft's avionics compartment alone, wearing a jacket with slits and carrying an empty tool bag, after receiving a text reading "Confirmed!! They just confirmed to me." The Government proved that a smuggling conspiracy existed and that Belloisi's conduct objectively served it. The court nonetheless held the evidence legally insufficient because the Government "failed to introduce evidence sufficient for a jury to find beyond a reasonable doubt that Belloisi knew" the specific unlawful object of the conspiracy he was found to have joined. The court applied *Lorenzo*, *Torres*, and *Samaria*, and vacated a 108-month sentence.

**C. Application to This Record**

The record here is weaker for the Government than the records in *Belloisi*, *Samaria*, *Lorenzo*, or *Torres*.

In each of those cases, the defendant was at least physically present at the criminal transaction, in proximity to identified co-conspirators. Here there was no such proof at all. The

14740649.1.49-120

Government pleaded conspiracies requiring agreement with at least one other person, and then proved that Petitioner had no relationship with any identified conspirator:

**(i)** Boateng — the cooperating witness the Government designated in its motions in limine (Dkt. 61) as a co-conspirator whose statements would be admissible under Rule 801(d)(2)(E) — testified that he had never heard of Bashiru Ganiyu and had never heard of Gani, LLC. (Tr. 195.) The Government conceded the point in summation: "Boateng did not know the defendant or work with him directly." (Tr. 346.) And in rebuttal: "just because Boateng did not know every money launderer or middleman . . . does not mean that the defendant was not in on this scheme." (Tr. 373.) That is an argument that the *absence* of evidence is not evidence of absence — not proof of agreement.

**(ii)** No victim knew Petitioner. Powell: "no interactions with Mr. Ganiyu at all." (Tr. 43.) Von Allmen: "never interacted with anyone from Gani, LLC." (Tr. 216.) Gruszecki: "at no time did Mr. Gruszecki speak with Mr. Ganiyu." (Tr. 265.) Jones: "never spoke with anyone from Gani, LLC." (Tr. 310.) The Government told the jury so in opening: "These people didn't know the defendant." (Tr. 42.)

**(iii)** No co-defendant or co-conspirator from any related case — Appiedu, Aning, Asante, or Freeman, all prosecuted in No. 21-cr-00088 (JSR) — was ever shown to know Petitioner. None testified. None identified him. The only evidence of any conspiracy in the record is evidence of a conspiracy among *other* people: between Boateng and Asante, and among Asante, Aning, Appiedu, Freeman, and others. The common feature of every one of those individuals is that none had any connection to Petitioner.

**(iv)** The out-of-court statements attributed to Asante — the sole evidentiary bridge —

14740649.1.50-120

were admitted only "subject to connection," and the connection was never made. *See* Ground Two, *infra*. Under *Tellier*, where "there was no independent corroborative evidence of [the defendant's] participation in that conspiracy, the proffered hearsay statement was inadmissible," and the Second Circuit reversed for insufficiency on plain-error review. 83 F.3d at 580-81. Stripped of the unconnected hearsay, the Government's proof of agreement is nonexistent.

What remains is a defendant who opened bank accounts **in his own name, with his own contact information** (Tr. 110), received deposits from strangers, moved money onward, and did so in a manner the Government called suspicious. That is precisely the "suspicious behavior" that *Torres* and *Nusraty* hold insufficient. It may establish knowledge, or willful blindness, or receipt of stolen property. It does not establish that Petitioner reached an agreement with any identified human being — which is what Counts One, Two, and Three required.

Trial counsel articulated exactly this in the Rule 33 motion, arguing that Boateng was not shown to be a member of any conspiracy with Petitioner and that nothing in the record established a conspiratorial agreement with Boateng or anyone else. (Dkt. 76.) This Court's three -page order denying the motion did not address the agreement element; it recited the volume of money and the absence of a legitimate business — proof of knowledge, not of agreement. (Dkt. 77.) The issue was preserved, developed, and ripe.

**D. Deficient Performance**

Appellate counsel had the trial transcripts, the Rule 33 motion, and the district court's order. The sufficiency issue required no extra-record development. It was preserved. It appeared on the face of the record in the single most quotable form available to any appellant — the Government's own cooperating witness disclaiming knowledge of the defendant, and the

14740649.1.51-120

Government's own opening statement conceding that no victim knew him. And it carried a remedy no evidentiary claim can carry: acquittal, with the protection of the Double Jeopardy Clause. *Burks v. United States*, 437 U.S. 1, 18 (1978).

Instead, counsel raised only the Rule 404(b) admission of a 2015 bail proceeding — an issue reviewed for abuse of discretion, subject to harmless-error analysis, and which the panel disposed of in a summary order. Under *Mayo*, *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000), and *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015), the omission of a preserved sufficiency claim in favor of a discretionary evidentiary claim is deficient performance.

**E. Prejudice**

Had the claim been raised, there is a reasonable probability the Second Circuit would have vacated the conspiracy convictions. *Belloisi* — decided four months before the panel affirmed here — demonstrates that this Circuit continues to enforce the agreement and knowledge elements rigorously, reversing outright even where a conspiracy indisputably existed and the defendant's conduct objectively advanced it. Petitioner's record contains less proof of agreement than Belloisi's did.

The consequences would have been dispositive. Counts One, Two, and Three are all conspiracy counts. Vacatur of Count One alone eliminates the "underlying offense" supporting § 2S1.1(a)(1) and, with it, the entire fraud-guideline apparatus. Vacatur of all three would leave only Count Four, receipt of stolen money under § 2315 — a count carrying a 120-month statutory maximum and, on these facts, a Guidelines range materially identical to the plea offer Petitioner rejected. *See* Ground Seven, *infra*.

14740649.1.52-120

## GROUND TWO: COUNSEL WAS INEFFECTIVE IN FAILING TO DEMAND A *GEANEY* FINDING AND TO MOVE TO STRIKE HEARSAY ADMITTED "SUBJECT TO CONNECTION"

### A. The Requirements of Rule 801(d)(2)(E)

To admit a co-conspirator statement, "the district court must find by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011). Where a court admits such statements provisionally, the defendant is entitled to a ruling at the close of the evidence — the practice this Circuit has followed since *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969). If the Government fails to connect up, the remedy is to strike, and where the prejudice cannot be cured, to declare a mistrial.

Co-conspirator statements are moreover "presumptively unreliable and, for such statements to be admissible, there must be some independent corroborating evidence of the defendant's participation in the conspiracy." *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996). *Tellier* is instructive on remedy: because "there was no independent corroborative evidence of [the defendant's] participation in that conspiracy, the proffered hearsay statement was inadmissible," and without it the evidence was insufficient — the court reversed outright on plain-error review. *Id.* at 580-81; accord *United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001).

### B. What Happened Here

When the Government elicited statements attributed to Fred Asante during Boateng's direct, counsel objected. The Court admitted them "subject to connection." (Tr. 184-85.) The

14740649.1.53-120

Government never returned to the subject. Counsel never asked for a *Geaney* ruling, never renewed the objection, and never moved to strike. The one-sentence Rule 29 motion — the natural moment to demand the finding — raised nothing.

The finding would have been genuinely contested. The Government's own witness testified that he had never heard of Petitioner or Gani, LLC. (Tr. 195.) The architecture proved was one in which Boateng dealt with Asante and Petitioner dealt with Asante, but Boateng and Petitioner never dealt with each other. Whether Petitioner and the declarants were "members" of a single conspiracy was the disputed question.

*United States v. Persing*, 436 F. App'x 13 (2d Cir. 2011) (summary order), is directly on point. There the district court admitted Rule 801(d)(2)(E) records "subject to connection" but never found a single conspiracy encompassing both the defendant and the declarant; its conditional language ("in furtherance of the conspiracy, **if there's a conspiracy**") reflected the absence of the required finding. The Second Circuit declined to presume the finding had been made implicitly, noting that "the court's statements reflected the absence of any finding" and that the evidence of common membership was "at best, weak." The same is true here, with the added fact that the declarant's own testimony affirmatively negated any connection to Petitioner.

### C. Related Foundation Failures

Counsel also permitted, without objection or foundation, extensive testimony and documents concerning persons who were not conspirators at all. The clearest example is Jacqueline Wichern. Boateng testified at length about Wichern's role, and the Government introduced a letter purportedly signed by her. (Tr. 3148, 3908.) On cross-examination, counsel attempted to establish what the record plainly showed — that Wichern was a victim, not a

14740649.1.54-120

member of any conspiracy:

> Q. Ms. Wichern was not a coconspirator.
> MS. KUDLA: Objection.
> THE COURT: Sustained.
> Q. She was a victim, right, Mr. Boateng.
> MS. KUDLA: Objection.
> THE COURT: Sustained.

(Tr. 5338.) The prosecutor's objections were well taken as to form. But their effect, combined with counsel's failure to lay any foundation of her own or to move to strike, was that the jury heard days of testimony about a non-conspirator's dealings while the defense was foreclosed from establishing her actual status. The Government thereby had it both ways: it elicited Wichern's statements and conduct as though she were part of the enterprise, and then successfully blocked the defense from establishing that she was not. Counsel never sought a limiting instruction, never renewed the inquiry in permissible form, and never asked the Court to resolve Wichern's status on the record.

The same pattern applies to the bank witnesses' recitations of third-party fraud claims. Such statements are admissible, if at all, for the non-hearsay purpose of showing *notice* to Petitioner — not for the truth of the claims. Counsel requested no limiting instruction on any of it.

**D. Prejudice**

The Asante statements were the only evidence tying Petitioner to the network Boateng described. Excise them and the Government's proof of *agreement* — as distinct from suspicious banking activity — disappears entirely. That is the *Tellier* posture: where the hearsay is the sole evidence of participation, its exclusion is dispositive. 83 F.3d at 580-81.

Counsel's failure also deprived Petitioner of appellate review. Had counsel demanded a

14740649.1.55-120

*Geaney* finding and moved to strike, the issue would have been preserved and reviewed for abuse of discretion on the record of an actual ruling. Instead, the absence of any ruling left appellate counsel with nothing to appeal, and left the sufficiency question — developed in Ground One, *supra* — unpreserved in its strongest form. Appellate counsel was independently ineffective in this respect as well: the absence of the required finding is apparent on the face of the transcript, and the claim could have been presented to the Second Circuit for plain-error review under Federal Rule of Criminal Procedure 52(b). *See United States v. Tellier*, 83 F.3d 578, 580-81 (2d Cir. 1996) (reversing on plain-error review where co-conspirator hearsay was admitted without independent corroborating evidence of the defendant's participation).

**GROUND THREE: COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST A MULTIPLE-CONSPIRACIES INSTRUCTION AND TO ARGUE VARIANCE**

**A. The Law**

"[A] multiple conspiracy charge is required whenever several conspiracies might be inferred from the evidence offered." *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir. 1979). The trial judge has an affirmative duty "to minimize . . . the threat of prejudicial 'spillover' of evidence by charging the jury concerning multiple conspiracies whenever there is sufficient evidence to support such a conclusion from the facts." *Id.* To promote the goal of "keeping distinct conspiracies distinct," *Kotteakos v. United States*, 328 U.S. 750, 770 (1946), the court "should describe explicitly the possibility of several conspiracies and instruct the jury that in order to convict a given defendant, it must find that he was a member of the conspiracy charged in the indictment and not some other conspiracy." *Cambindo Valencia*, 609 F.2d at 625.

The principle traces to Judge Friendly's opinion in *United States v. Borelli*, 336 F.2d 376

14740649.1.56-120

(2d Cir. 1964): "[T]he gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed **as to each defendant**." *Id.* at 384 (emphasis added). Where "the extreme links of a chain conspiracy have no reason to know that others are performing a role similar to theirs, there is more than one conspiracy," unless the scale of operations supports an inference that participants at a level must have known of others performing similar roles. *United States v. Miley*, 513 F.2d 1191, 1206-07 (2d Cir. 1975) (Friendly, J.). Accord *United States v. Bertolotti*, 529 F.2d 149, 156-59 (2d Cir. 1975) (reversing upon finding at least four conspiracies).

In *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001), the court reaffirmed "a long-standing principle of this Court's law of conspiracy that 'nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it,'" quoting *United States v. Peoni*, 100 F.2d 401, 403 (2d Cir. 1938). *McDermott* rejected the Government's attempt "to redefine a conspiracy by its purpose, rather than by the agreement of its members to that purpose," and reversed where the defendant's agreement did not extend to a second spoke about whom he knew nothing.

**B. The Proof Described a Rimless Wheel**

The superseding indictment charged a single conspiracy in each of Counts One, Two, and Three. The proof described something else. Boateng testified to a Ghana-based enterprise moving $100 to $150 million across roughly 3,000 transactions over nine years, involving numerous "Fraud Boys," numerous middlemen, and numerous launderers — and testified that he did not know every launderer or middleman in it. He had never heard of Bashiru Ganiyu or Gani, LLC. (Tr. 195.)

14740649.1.57-120

No witness connected Petitioner to Boateng. No witness connected Petitioner to any "Fraud Boy" by name. No witness connected Petitioner to Asante, Freeman, Aning, or Appiedu. The Government's link was structural: Petitioner sent money to some of the same overseas recipients that others in the network used. That is the classic hub-and-spoke pattern in which the spokes deal with a common hub but never with one another. *Kotteakos*, 328 U.S. at 754-55. Without a rim, the wheel is not a single conspiracy. *McDermott*, 245 F.3d at 137-39.

This was the *defense's own theory*. Counsel argued in summation that Boateng's "most important testimony" was that "he never heard of my client." She argued the factual premise of a variance defense while never requesting the legal instrument that would have permitted the jury to act on it.

**C. Spillover**

Through Boateng the jury heard about bribery of police officers and embassy personnel, insurance-fraud arsons, land-guard violence, prostitution, and related conduct in Ghana. None of it involved Petitioner. It came in without objection and without any instruction telling the jury it could convict only if it found *him* a member of *the* charged conspiracy and not some other conspiracy Boateng described.

**D. Deficient Performance and Prejudice**

Requesting a multiple-conspiracies instruction is standard practice in any multi-participant conspiracy case and was cost-free. Counsel participated in a full charge conference and requested nothing of the kind. There is no strategic reading of that omission — the instruction was the doctrinal vehicle for her own closing argument.

The prejudice is measured by what the jury was permitted to do without it. The sole

14740649.1.58-120

contested issue was whether Petitioner *agreed* to join the charged conspiracy. The jury heard days of testimony about a criminal enterprise he was never shown to have joined, with no instrument confining that evidence, and was never told that guilt required membership in the charged conspiracy rather than knowledge of *a* conspiracy. This ground is closely related to Ground One: the same evidentiary gap that made a multiple-conspiracies instruction necessary also rendered the evidence insufficient. Appellate counsel was likewise ineffective in failing to raise the omission of the instruction on plain-error review, which was available on the face of the charge conference and the jury charge. *See United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir. 1979).

## GROUND FOUR: COUNSEL WAS INEFFECTIVE IN FAILING TO MOVE TO SUPPRESS THE WARRANTLESS SEARCH OF PETITIONER'S CELL PHONES

### A. Governing Standard

Where counsel fails to litigate a Fourth Amendment issue competently, the petitioner must show "that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). *Kimmelman* granted relief where counsel filed no suppression motion because he had conducted no pretrial discovery — a failure "not based on 'strategy,' but on counsel's mistaken beliefs." *Id.* at 385.

### B. The Search Was a Fourth Amendment Search

On August 16, 2021, agents at JFK "manually review[ed]" both of Petitioner's cell phones, "scroll[ing] through various folders, like photographs and chats." (Tr. 48.) That this constituted a "search" is beyond dispute. In *United States v. Sam*, 2020 U.S. Dist. LEXIS 87143

14740649.1.59-120

(W.D. Wash. May 18, 2020), the court held that "the FBI physically intruded on Mr. Sam's personal effect when the FBI powered on his phone to take a picture of the phone's lock screen" — a Fourth Amendment search under the trespass theory of *United States v. Jones*, 565 U.S. 400, 404-05 (2012). If merely powering on a phone is a search, scrolling through its photograph and chat folders is a search *a fortiori*. The Government has never contended otherwise; its position was that the search was *reasonable* under the border-search exception, not that no search occurred.

**C. The Motion Counsel Should Have Filed**

On May 11, 2023 — nearly a year before this trial, and by a judge of this Court — *United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023) (Rakoff, J.), held that "phone searches at the border generally require warrants outside exigent circumstances." *Id.* at 398. Judge Rakoff reasoned that "[n]one of the rationales supporting the border search exception justifies applying it to searches of digital information contained on a traveler's cell phone, and the magnitude of the privacy invasion caused by such searches dwarfs that historically posed by border searches." *Id.* at 394. That reasoning follows from *Riley v. California*, 573 U.S. 373, 393-94 (2014) (cell phones "differ in both a quantitative and a qualitative sense from other objects" and can reconstruct "[t]he sum of an individual's private life"), and *Carpenter v. United States*, 585 U.S. 296, 311-12 (2018).

Two months after this trial, the Eastern District reached the same conclusion twice. *United States v. Sultanov*, 2024 WL 3520443, at *23 (E.D.N.Y. July 24, 2024);* United States v. Fox, *2024 WL 3520767, at* 17 (E.D.N.Y. July 24, 2024).

Even under the more permissive frameworks, this search was vulnerable. The Fourth

14740649.1.60-120

Circuit requires "individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019). The Ninth Circuit limits device searches to searches for digital contraband. *United States v. Cano*, 934 F.3d 1002, 1018 (9th Cir. 2019). Petitioner was suspected of *domestic financial fraud* — an offense with no nexus to customs control, contraband interdiction, or national security. Nothing about a romance-fraud laundering investigation implicates "the recognized right of the sovereign to control . . . who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 620 (1977).

The record establishes that the border was a pretext. The Government's own supplemental in limine letter states that the agent who conducted the inspection "was assigned as one of the case agents investigating the Fraud Scheme" both "prior to and after the secondary inspection." (Dkt. 69 at 2.) This was not a customs inspection that happened to yield evidence. It was an investigative search of a domestic fraud suspect, conducted at an airport to avoid the warrant requirement.

**D. Deficient Performance**

Counsel had actual, written notice. The Government's supplemental in limine letter, served April 1, 2024, disclosed that agents had "manually reviewed the cellular devices in the defendant's possession during a secondary inspection at John F. Kennedy ('JFK') International Airport in August 2021." (Dkt. 69 at 2.) *Smith* had been decided by a judge of the same court eleven months earlier and was widely reported. Counsel filed nothing.

No strategic justification exists. Suppression of GX 401, 402, and 408 would have cost

14740649.1.61-120

the defense nothing. The good-faith exception, on which the Government would have relied, applies only to "searches conducted in objectively reasonable reliance on **binding appellate precedent**" — precedent "specifically authoriz[ing]" the practice. *Davis v. United States*, 564 U.S. 229, 241 (2011). As of August 2021, no Second Circuit or Supreme Court decision authorized warrantless cell-phone searches at the border. The absence of binding precedent is not the presence of it. *Cano*, 934 F.3d at 1022 (distinguishing conduct that is "plausibly . . . permissible" from conduct binding precedent "specifically authorize[s]"); *United States v. Ganias*, 824 F.3d 199, 238 (2d Cir. 2016) (en banc) (Chin, J., dissenting) (where "precedent were unclear as to what was allowed, the answer was not for agents to venture alone into uncharted constitutional territory").

**E. Prejudice**

The suppressed evidence went to the only contested issue in the case. The photograph of Dennis Powell's $200,000 cashier's check, stored on Petitioner's own phone, was the Government's most vivid item of proof on knowledge — and the Powell check was the sole overt act pleaded in Count Three. Without it, Count Three's overt-act allegation loses its evidentiary anchor, and the Government's knowledge case rests on inference from banking patterns alone.

The prejudice extends further through the fruits doctrine. The September 20, 2021 warrant for the ganitruck@ganillc.com Google account rested expressly on the phone's contents: "GANIYU has stored a communication that appears to be about money laundering in the Red iPhone 11." Everything obtained from that account is a derivative fruit. *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). Excise the phone search and the warrant affidavit loses its core averment.

14740649.1.62-120

## GROUND FIVE: COUNSEL WAS INEFFECTIVE IN FAILING TO ARGUE THAT DOWNSTREAM RECEIPT OF FUNDS DID NOT CONSTITUTE WIRE OR MAIL FRAUD

### A. The Mailing or Wiring Must Be In Furtherance of the Scheme

The mail and wire fraud statutes "do[] not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 95 (1944). A transmission qualifies only if it is "part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck v. United States*, 489 U.S. 705, 715 (1989). Conversely, "[a] mailing cannot be said to be in furtherance of a scheme to defraud when it occurs after the scheme has reached fruition." *United States v. Altman*, 48 F.3d 96, 103 (2d Cir. 1995).

The Supreme Court has applied this limit consistently. In *Kann*, defendants cashed fraudulently obtained checks; the interbank mailings that followed were not in furtherance because "[t]he scheme . . . had reached fruition. The persons intended to receive money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." 323 U.S. at 94. In *Parr v. United States*, 363 U.S. 370, 393 (1960), mailings of credit-card statements and payment checks came too late. In *United States v. Maze*, 414 U.S. 395, 402 (1974), the scheme "reached fruition when [the defendant] checked out of the motel," so subsequent invoicing could not sustain the conviction.

The Second Circuit enforces this boundary. In *Altman*, the court reversed mail fraud convictions where "[b]y the time Attorney Braslow mailed to Altman an acknowledgment of the receipt of Altman's . . . accounting . . . the looting of the estate was long past." 48 F.3d at 103-04. Accord *United States v. Redcorn*, 528 F.3d 727, 741-42 (10th Cir. 2008) (transfer between

14740649.1.63-120

personal accounts was not "necessary to gain control over the funds" and thus not part of the scheme); *United States v. Smith*, 934 F.2d 270, 272 (11th Cir. 1991) (reversing where "the mailing was not proven to be necessarily incident to an essential part of the scheme").

**B. *Waddell*: A Downstream Transfer After the Fraud Is Complete Cannot Sustain a Wire Fraud Count**

The Eleventh Circuit's decision in *United States v. Waddell*, 840 F. App'x 421, 2020 U.S. App. LEXIS 40248, No. 18-10980 (11th Cir. Dec. 23, 2020), is directly on point and illustrates the analysis counsel never undertook. Waddell defrauded victims into wiring money for precious metals they never received. The Government charged, as Count 1, not the victim's incoming wire but a later, downstream wire by which Waddell moved the money to his own casino account.

The Eleventh Circuit **reversed the denial of Waddell's motion for judgment of acquittal on that count**, holding that "the district court erred in denying Defendant's motion for judgment of acquittal on Count 1 because the fraud was complete before Defendant executed the downstream wire transfer charged in Count 1." The court reasoned that "[t]he first wiring from Folkenberg to the corporate account clearly supported a wire fraud charge because it was necessary to further the scheme. Indeed, obtaining Folkenberg's money was the scheme. For unexplained reasons, the Government did not charge this wire transaction. Instead, it charged the final downstream wire transfer." Because the perpetrator had "wrested from the clutches of the corporate account" the victim's money and "had taken ownership of that money," the "scheme was complete as to that money," and "[w]hat he subsequently chose to do with those funds was not incident to an essential part of the fraudulent scheme."

*Waddell* expressly rested that holding on *Kann*, and on the same authorities set out above:

14740649.1.64-120

*Kann*, 323 U.S. at 93-94; *United States v. Smith*, 934 F.2d 270, 272 (11th Cir. 1991); and *United States v. Redcorn*, 528 F.3d 727, 741-42 (10th Cir. 2008). It also rejected the Government's fallback argument that the downstream wire was part of a "continuing scheme," holding that the lulling exception did not apply because there was "no evidence of lulling" and the Government "failed to show how Defendant's transfer of money to his casino account would tend to prevent Folkenberg from discovering the fraudulent scheme."

The parallel to this case is exact. The wires that furthered the frauds here were the victims' incoming transfers — Powell's, Von Allmen's, Gruszecki's, and Jones's payments induced by the personas who deceived them. Those wires "clearly supported a wire fraud charge because [they were] necessary to further the scheme." *Waddell.* Obtaining the victims' money *was* the scheme. What Petitioner did after those funds arrived — forwarding them to Sinotruk, Yiwu Yaxiya, Xp Lab, Fog Logistics, and similar recipients — is the downstream transfer that *Waddell* holds cannot sustain a wire fraud count. And as in *Waddell*, there was no evidence of lulling: no victim testified to receiving any communication from Petitioner, and the Government never showed how his onward transfers would "tend to prevent" any victim "from discovering the fraudulent scheme." To the contrary, every victim testified that he learned of the fraud from his bank or from his own family, not from anything Petitioner did or failed to do.

**B. Application**

The Government's theory was that overseas "Fraud Boys" groomed victims, induced them to send money, and directed those funds to Petitioner's accounts. On that theory, each fraud "reached fruition" when the victim parted irrevocably with her money. Every victim who testified confirmed the sequence: each was deceived by a persona, each was *then* instructed by a third party to send funds to Gani, LLC, and none had any dealing with Petitioner. Powell was

14740649.1.65-120

instructed by "Barrister Trent" (Tr. 33-36); Von Allmen by "Mark Hayford" (Tr. 214); Gruszecki and Jones by their respective personas. What Petitioner did afterward — receiving deposits and moving funds onward — was, in *Kann's* words, immaterial to "any consummation of the scheme."

The Government's own characterizations confirm the point. It described Petitioner as a "money washer" whose "job" began only after "[t]he fraud boys instruct the victims to send money." (Tr. 347.) That is the language of post-fraud conduct. Congress has provided statutes precisely for it: 18 U.S.C. §§ 1956 and 1957 (money laundering), § 2315 (receipt of stolen property), and § 1960 (unlicensed money transmitting). Notably, the Government charged two of those very statutes against Freeman in the related case, obtaining convictions under §§ 1960(a) and 371 for operating an unlicensed money transmitting business — the offense that actually described this conduct.

**C. Deficient Performance**

Counsel never made this argument — not in a motion to dismiss Count One, not in the Rule 29 motion, not in the Rule 33 motion, and not in a request for an instruction defining the "in furtherance" element by reference to *Kann* and *Maze*. The one-sentence Rule 29 motion is especially damaging: when the Court asked "In any particular respect?" and "Have you fully stated the grounds you wish to advance?", counsel had two express invitations to preserve this issue and declined both.

The distinction between a completed fraud and an ongoing one is the central legal question in every downstream-receipt prosecution. A lawyer who does not brief the dispositive legal question in her client's case has not made a strategic choice; she has failed to identify the

14740649.1.66-120

issue. *Wiggins*, 539 U.S. at 522-23.

**D. Prejudice**

Count One was the linchpin of everything. Under *Waddell*, a properly framed Rule 29 motion directed at the "in furtherance" element would have required the district court to identify which wire or mailing executed the scheme — a question the one-sentence motion never posed. It supplied the "underlying offense" that drove the PSR's application of U.S.S.G. § 2S1.1(a)(1) — which in turn imported the entire § 2B1.1 loss table, the four-level substantial-hardship enhancement, and the two-level foreign-scheme enhancement. Elimination of Count One would have collapsed the Guidelines calculation to the third-party-launderer provision of § 2S1.1(a)(2), exactly as the Government itself calculated Freeman's. *See* Ground Eight, *infra*. The prejudice is therefore not confined to one count of conviction; it is the difference between offense level 37 and offense level 24. Appellate counsel was independently ineffective in failing to raise on plain-error review the question whether any charged wire or mailing was in furtherance of a scheme that had already reached fruition.

**GROUND SIX: COUNSEL WAS INEFFECTIVE IN FAILING TO ARGUE THAT THE WIRE AND MAIL FRAUD STATUTES DO NOT APPLY EXTRATERRITORIALLY**

**A. The Presumption Against Extraterritoriality**

"[L]egislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). Courts ask first whether the statute gives "a clear, affirmative indication that it applies extraterritorially," and if not, whether "the conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 337

14740649.1.67-120

(2016).

The Second Circuit has held that § 1343 does not apply extraterritorially. *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014), *rev'd on other grounds*, 579 U.S. 325 (2016); *see also Bascuñán v. Elsaca*, 927 F.3d 108, 121-22 (2d Cir. 2019); *United States v. Hoskins*, 902 F.3d 69, 96 (2d Cir. 2018). *Morrison* confirmed that "even statutes that contain broad language in their definitions of 'commerce' that expressly refer to 'foreign commerce' do not apply abroad." 561 U.S. at 262-63.

Nor does *United States v. Bowman*, 260 U.S. 94 (1922), assist the Government. *Bowman* recognized extraterritorial reach only for statutes enacted "because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated," *id.* at 98, and expressly excluded "[c]rimes against private individuals or their property, like assaults, burglary, larceny, robbery, arson, embezzlement, and **frauds of all kinds**," which "must, of course, be committed within the territorial jurisdiction of the government." *Id.* (emphasis added). The Second Circuit has confirmed that the *Bowman* rule does not extend to crimes against private individuals. *United States v. Gatlin*, 216 F.3d 207, 211 n.5 (2d Cir. 2000).

**B. The Domestic-Conduct Requirement**

Because § 1343 has no extraterritorial reach, the prosecution must be a *domestic application*. Mere use of a domestic wire is not enough. In *Bascuñán*, the court required that domestic wires be a "core component of the scheme to defraud," 927 F.3d at 122, and in *United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2020), the court held that "the use of the . . . wires must be essential, rather than merely incidental, to the scheme to defraud," so that "the domestic tail [does] not wag, as it were, the foreign dog." District courts in this District require that a

14740649.1.68-120

defendant or co-conspirator commit a substantial amount of conduct in the United States that is integral to the scheme. *United States v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 71-73 (S.D.N.Y. 2015); *Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768, 784 (S.D.N.Y. 2016).

**C. Application**

The Government's proof placed the *scheme to defraud* abroad. Boateng testified the operation was run from Ghana; the "Fraud Boys" who created false personas, groomed victims, and made every material misrepresentation were overseas. No witness testified that Petitioner or anyone in the United States devised the scheme or communicated a falsehood to a victim. The Government confirmed this at sentencing: "These are crimes that are often committed in many aspects abroad." (Sent. Tr. 8.) Most tellingly, the PSR applied a two-level enhancement under § 2B1.1(b)(10) precisely because "a substantial part of the scheme was committed from outside the United States." The Government's own Guidelines position was that the scheme was foreign.

Grounds Five and Six reinforce one another. If the fraud was consummated abroad before Petitioner's accounts received anything (Ground Five), then his domestic accounts cannot be "integral to the commission of the scheme to defraud" (Ground Six), because by then there was no scheme left to commit. Petitioner's receipt of already-stolen funds is the "incidental" domestic contact that *Napout* and *Bascuñán* hold insufficient.

**D. Prejudice**

The extraterritoriality principle carries directly into sentencing, where it independently reduces the Guidelines. In *United States v. Azeem*, 946 F.2d 13, 16-17 (2d Cir. 1991), this Circuit declined to include foreign criminal activity in a base offense level, reasoning that doing so "would require courts to perform a careful comparative analysis of foreign and domestic law."

14740649.1.69-120

The Ninth Circuit followed *Azeem* in *United States v. Chao Fan Xu*, 706 F.3d 979, 992 (9th Cir. 2013), holding that foreign conduct could not satisfy § 2S1.1(a)(1)(A) and remanding "for resentencing under § 2S1.1(a)(2)." Counsel's failure to identify the extraterritoriality issue deprived Petitioner of both the trial argument and the sentencing argument that flows from it. *See* Grounds Eight and Ten, *infra*. Appellate counsel was likewise ineffective in failing to raise the extraterritoriality of §§ 1341 and 1343 on plain-error review; the issue is purely legal, requires no factual development, and appears on the face of the indictment and the Government's own Guidelines position.

## GROUND SEVEN: COUNSEL WAS INEFFECTIVE IN THE PLEA-BARGAINING PROCESS, INCLUDING BY FAILING TO ADVISE PETITIONER OF THE IMMIGRATION CONSEQUENCES OF CONVICTION

### A. The Right to Effective Assistance in Plea Bargaining

"[C]riminal defendants require effective counsel during plea negotiations." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). Where deficient advice causes rejection of a favorable offer, prejudice is shown by a reasonable probability that (1) the defendant would have accepted the offer, (2) the prosecution would not have withdrawn it, and (3) the court would have accepted its terms, and that the resulting sentence would have been less severe. *Id.* at 164; *Missouri v. Frye*, 566 U.S. 134, 147 (2012). Counsel's duty is to provide "an informed opinion as to what plea should be entered," requiring an assessment of "the strength of the government's case" and "the risks of proceeding to trial." *Purdy v. United States*, 208 F.3d 41, 44-45 (2d Cir. 2000).

### B. Disparity as Objective Evidence of Prejudice

The Second Circuit treats a wide disparity between the offer and the post-trial sentence as

14740649.1.70-120

objective evidence supporting the assertion that the defendant would have pleaded guilty. In *United States v. Gordon*, 156 F.3d 376, 380-81 (2d Cir. 1998), the court found the disparity between an 84-month offer and a 262-327 month range "sufficient objective evidence . . . to support a finding of prejudice under *Strickland*." In *Mask v. McGinnis*, 233 F.3d 132, 142 (2d Cir. 2000), the court held that "[a] large disparity between the defendant's sentence exposure following a trial and his potential exposure had a plea offer been made . . . coupled with defendant's statements that he would have accepted a reasonable offer" satisfies prejudice. Accord *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003); *Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011). *Gordon* also rejected any distinction between formal and informal offers, holding that the petitioner "was nonetheless prejudiced because he did not have accurate information upon which to make his decision to pursue further plea negotiations or go to trial." 156 F.3d at 381.

The Ninth Circuit applies the same principle. In *United States v. Blaylock*, 20 F.3d 1458, 1466-67 (9th Cir. 1994), the court held that counsel's failure regarding a plea offer was prejudicial where the defendant faced a substantially longer sentence after trial, and that the remedy must be tailored to the lost opportunity. In *Nunes v. Mueller*, 350 F.3d 1045, 1052-54 (9th Cir. 2003), the court granted relief where counsel misinformed the defendant about a plea offer, holding that the disparity between the offer and the sentence imposed supported prejudice and that an evidentiary hearing was required. In *Riggs v. Fairman*, 399 F.3d 1179, 1183 (9th Cir. 2005), the court found deficient performance where counsel failed to investigate and therefore misadvised the defendant about his exposure before he rejected a favorable offer. And in *United States v. Booth*, 432 F.3d 542, 549-50 (3d Cir. 2005), applying reasoning the Ninth Circuit has followed, the court held that the loss of a sentencing benefit available only through a plea

14740649.1.71-120

constitutes prejudice.

*Lee v. United States*, 582 U.S. 357 (2017), completes the framework. *Lee* holds that a defendant may establish prejudice by showing he would have rejected the path counsel steered him toward, and that courts "should not upset a plea solely because of post hoc assertions" but must "look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Id.* at 369. Where the objective circumstances at the time make the defendant's claimed preference rational, prejudice is established. *Id.* at 371 ("Not everything is a numbers game.").

**C. The Disparity Here**

The offer carried a stipulated Guidelines range of 46 to 57 months on a single § 2315 count with a 10-year statutory maximum. Petitioner received **156 months** — more than three times the top of the offered range, and 99 months beyond its ceiling. That exceeds the disparities the Second Circuit found sufficient in *Pham* and *Raysor*, and is comparable to *Gordon*.

The contemporaneous evidence *Lee* requires is present in the record and in the related cases. Petitioner's exposure on a § 2315 plea was capped at 120 months by statute; his exposure after trial on Counts One and Two was 240 months each. Every launderer in this enterprise who resolved his case by plea received a sentence at or below the offer's range or close to it — Aning received 24 months. The only two who went to trial, Freeman and Petitioner, received 78 months (later reduced to 63) and 156 months respectively. A defendant advised of that landscape in December 2023 would have had every rational reason to accept 46 to 57 months.

**D. The Deficient Advice**

Petitioner sets forth in his accompanying sworn declaration what he was and was not told. In summary: he was never advised that his post-trial Guidelines range would be 210 to 262

14740649.1.72-120

months, or anything approaching it. He was never told that Counts One and Two each carried a 20-year statutory maximum, five times the exposure of the offered count and double the § 2315 maximum. He was never told that the Guidelines would treat him as a *direct* money launderer under § 2S1.1(a)(1) and import the entire fraud loss table, or that the Government would use gross deposits rather than traced proceeds as the loss figure. He was never told that the Government would seek vulnerable-victim and substantial-hardship enhancements that it had not sought against any other launderer in the enterprise. And he was never told that other launderers in the same enterprise — Aning, Asante, and Freeman — had already been prosecuted and sentenced in this District, or what they had received.

Had counsel conducted the most elementary investigation — reading the docket in *United States v. Appiedu*, No. 21-cr-00088 (JSR) — she would have learned that the Government's own benchmark for the top launderer in the enterprise was 120 months, that the most culpable defendant received 108, and that a defendant convicted at trial on seven counts received 78 months, later reduced to 63 months. She would have been able to tell Petitioner, accurately, that going to trial risked a sentence multiples of the offer while the offer itself was in line with what pleading defendants received. She told him none of this because she did not know it.

**E. Prejudice**

The prejudice is 99 months at minimum, and on the face of the record considerably more. Had Petitioner accepted the offer, he would have pleaded to a single § 2315 count with a stipulated range of 46 to 57 months and a statutory maximum of 120 months. He would also have been eligible for a three-level acceptance-of-responsibility reduction under § 3E1.1 and, as a zero-point offender, for the two-level reduction of § 4C1.1 — the reduction that took Freeman from 78 months to 63 months. Instead he stands convicted on four counts and serving 156

14740649.1.73-120

months.

**F. Counsel Was Independently Ineffective in Failing to Advise Petitioner of the Immigration Consequences of Conviction and to Seek an Immigration-Neutral Disposition**

Petitioner is a lawful permanent resident of the United States and has been since 2012. His parents, both now deceased, were United States citizens. His two minor children are United States citizens. He has lived in this country lawfully for well over a decade. Counsel never asked him his immigration status. Counsel never discussed his family circumstances. Counsel never mentioned the word "deportation," and never advised him that a conviction on any of the charged counts would expose him to mandatory removal.

*Padilla v. Kentucky*, 559 U.S. 356 (2010), holds that the Sixth Amendment requires counsel to advise a noncitizen client of the deportation consequences of a conviction. "[C]ounsel must inform her client whether his plea carries a risk of deportation." *Id.* at 374. Where "the deportation consequence is truly clear," "the duty to give correct advice is equally clear." *Id.* at 369. The Court emphasized that deportation is "an integral part — indeed, sometimes the most important part — of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes," *id.* at 364, and that "[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence," *id.* at 368 (quoting *INS v. St. Cyr*, 533 U.S. 289, 322 (2001)).

*Padilla's* duty is not satisfied by silence. Counsel who says nothing at all fails the client as surely as counsel who misadvises. Courts have found deficient performance on far thinner facts than these. *See United States v. Swaby*, 855 F.3d 233, 240 (4th Cir. 2017) (deficient performance where counsel advised that "the plea agreement presented only a risk, but not a certainty, of

14740649.1.74-120

deportation," when counsel "only needed to read the correct version of the statute to determine that the crime was an aggravated felony"); *United States v. Rodriguez-Vega*, 797 F.3d 781, 786 (9th Cir. 2015) (deficient performance in failing "to advise [defendant] that her conviction rendered her removal virtually certain"); *United States v. Murillo*, 927 F.3d 808, 811 (4th Cir. 2019); *United States v. Akinsade*, 686 F.3d 248, 250 (4th Cir. 2012).

The failure here was more fundamental than misadvice. Counsel never made the inquiry at all. A lawyer who does not ask a client his immigration status cannot form a professional judgment about what advice the client needs, and cannot make the "strategic choice" that *Strickland* protects. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003).

***1. Counsel failed to seek an immigration-neutral disposition***

*Padilla* imposes a second obligation that counsel also disregarded. Effective representation during plea negotiation requires counsel to take adequate steps to "[p]reserv[e] [a noncitizen defendant's] right to remain in the United States" and to "preserv[e] the possibility of discretionary relief from deportation." 559 U.S. at 373 (quoting *St. Cyr*, 533 U.S. at 323). As the Court observed, "informed consideration of possible deportation" by both defense counsel and the prosecution "can only benefit both the State and noncitizen defendants during the plea-bargaining process," because "[b]y bringing deportation consequences into this process, the defense and prosecution may well be able to reach agreements that better satisfy the interests of both parties." *Id.* at 373.

Judge Posner's opinion in *DeBartolo v. United States*, 790 F.3d 775 (7th Cir. 2015), makes the point concretely. Rejecting the argument that a defendant facing strong evidence could not have been prejudiced, the Seventh Circuit explained that even a defendant who knew

14740649.1.75-120

acquittal was unlikely "would still have had reasons to reject the plea offer," because "**[h]e could have tried to negotiate a different plea deal for an offense that does not make deportation mandatory.**" *Id.* at 779. The court illustrated the point with a concrete alternative charge that would have carried the same sentence without mandatory removal, and held that "[t]here was a reasonable probability that he would not have pleaded guilty, and that is all that matters to our decision." *Id.*

The Sixth Circuit adopted the same rule in *Rodriguez-Penton v. United States*, 905 F.3d 481, 488-89 (6th Cir. 2018), holding that a petitioner "may demonstrate prejudice if he can show that, had he known about the risk of adverse immigration consequences, he would have bargained for a more favorable plea," and that a court errs by confining the prejudice inquiry to whether the defendant would have gone to trial. And the Fourth Circuit in *Swaby* held that a petitioner "need only demonstrate" a reasonable probability of a different outcome — not that an immigration-neutral plea was "even an attractive option" to the Government. 855 F.3d at 244. In assessing that probability, courts weigh the defendant's ties to this country. *Id.* at 243 (crediting the defendant's "long familial" connections, including a citizen spouse and children).

*2. Application*

Petitioner's ties are among the strongest a noncitizen defendant can present: lawful permanent residence since 2012, two United States citizen children who are minors, and two now -deceased United States citizen parents. He has no other country in which he has built a life.

An immigration-conscious negotiation was available and was never attempted. The offer counsel conveyed was a plea to receipt of stolen money under 18 U.S.C. § 2315 with a stipulated range of 46 to 57 months. A conviction of that offense, with a term of imprisonment of one year

14740649.1.76-120

or more, constitutes an aggravated felony under 8 U.S.C. § 1101(a)(43)(G), rendering removal mandatory and foreclosing cancellation of removal, 8 U.S.C. § 1229b(a)(3). Counsel never analyzed that consequence, never advised Petitioner of it, and never attempted to negotiate around it — for example by seeking a stipulated sentence of less than one year on a qualifying count, by proposing a different offense of conviction, or by structuring the disposition to preserve eligibility for discretionary relief. Each of those was the kind of "agreement[] that better satisf[ies] the interests of both parties" that *Padilla* contemplates. 559 U.S. at 373.

Petitioner does not contend that the Government was obliged to offer an immigration-neutral plea. He contends, as *DeBartolo* and *Rodriguez-Penton* hold is sufficient, that counsel was obliged to *try*, and that there is a reasonable probability the effort would have produced a materially different result — either a disposition preserving his ability to remain with his citizen children, or, at minimum, a plea to the 46-to-57-month range he was offered and would have accepted.

*3. Prejudice*

The prejudice is twofold. First, had Petitioner been advised that conviction meant mandatory separation from his two citizen children, that advice would have borne directly on the decision he was making in December 2023, and would have made acceptance of a 46-to-57-month disposition more attractive, not less — because after trial he faced both a far longer sentence *and* the same removal consequence. *See Lee v. United States*, 582 U.S. 357, 369 (2017) (courts must "look to contemporaneous evidence to substantiate a defendant's expressed preferences"). Second, the failure cost him the opportunity to bargain for a disposition that might have preserved his lawful status entirely. Under *DeBartolo*, that lost opportunity is itself the prejudice: he "could have tried to negotiate a different plea deal for an offense that does not

14740649.1.77-120

make deportation mandatory," and counsel's silence ensured he never did. 790 F.3d at 779.

Because this claim turns on communications outside the trial record, it cannot be resolved on the papers. *See* Part V, *infra*.

## GROUND EIGHT: COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE APPLICATION OF U.S.S.G. § 2S1.1(a)(1) INSTEAD OF § 2S1.1(a)(2)

### A. The Guideline's Structure

In 2001 the Sentencing Commission amended § 2S1.1 "to tie offense levels for money laundering more closely to the underlying conduct that was the source of the criminally derived funds." *United States v. Blackmon*, 557 F.3d 113, 119 (3d Cir. 2009). The amendment created a deliberate two-track structure. Subsection (a)(1) governs "direct money launderers" — "offenders who commit[ted]" the crime that "generated the criminal proceeds." Subsection (a)(2) governs "third party launderers" — "offenders who launder[ed] the proceeds generated from [the] underlying [crimes]" that they did not "commit." U.S.S.G. Supp. to App. C, Amend. 634. The Second Circuit recognizes the distinction. *United States v. Menendez*, 600 F.3d 263, 266-67 (2d Cir. 2010).

Subsection (a)(1) applies only if "(A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined." Otherwise, subsection (a)(2) supplies "8 plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the laundered funds."

Two textual features are critical. First, the cross-reference is to § 1B1.3(a)(1)(**A**) only — the defendant's *own* acts — and pointedly not to § 1B1.3(a)(1)(B), jointly-undertaken-activity

14740649.1.78-120

accountability. The Commission excluded reasonably-foreseeable-conduct accountability from the (a)(1) trigger. Second, Application Note 2(B) states: "The fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, without additional involvement in the underlying offense, does not establish that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the underlying offense."

When (a)(2) applies, the specific offense characteristics of § 2B1.1 do not come along; only the *table* is imported. The four-level substantial-hardship enhancement, § 2B1.1(b)(2)(B), and the two-level foreign-scheme enhancement, § 2B1.1(b)(10), are specific offense characteristics of the fraud guideline and drop out. *See United States v. Pratt*, 728 F.3d 463, 481 (5th Cir. 2013) (a § 2B1.1 enhancement "is found under special offense characteristics in section 2B1.1 and is not applicable to a crime that falls under section 2S1.1").

**B. Petitioner Was the Paradigm Third-Party Launderer**

The Government's theory, from indictment through sentencing, was that others committed the fraud and Petitioner received the money. It called a cooperator who testified the frauds were run from Ghana by "Fraud Boys." It never alleged Petitioner devised a scheme, contacted a victim, or made a misrepresentation. It told the jury his "job" began when "[t]he fraud boys instruct the victims to send money to the money washers." (Tr. 347.) At sentencing it accepted the "getaway driver" characterization, arguing only that the driver's role was "essential." (Sent. Tr. 6-7.) On the Commission's own definitions, that is a third-party launderer.

**The Government itself so calculated in the companion case.** Celvin Freeman was convicted at trial on all seven counts — including conspiracy to commit wire fraud under § 1349,

14740649.1.79-120

substantive wire fraud under § 1343, money laundering, conspiracy to receive stolen money, and receipt of stolen money. Those are the same counts charged here, plus three more. And the Government's sentencing submission stated: "Pursuant to U.S.S.G. § 2S1.1(a)(2), the base offense level is eight." (Dkt. 126 at 11.) The Probation Office agreed. No one suggested that Freeman's § 1349 conviction made him a *direct* launderer.

The reasoning behind the guideline confirms the point. If membership in the fraud conspiracy always converts a launderer into a direct launderer, then there would be no case in which a money-laundering defendant who only offered independent laundering services — even to several fraud organizations — did not commit the "underlying offense" of subsection (a)(1). That reading would render subsection (a)(2) superfluous in every case except where the underlying offense level is impossible to determine. The Commission created (a)(2) precisely to capture launderers like Petitioner; a reading that empties it of content cannot be right.

The Ninth Circuit's decision in *United States v. Chao Fan Xu*, 706 F.3d 979 (9th Cir. 2013), is closely analogous. There, defendants convicted of RICO conspiracy predicated on money laundering were sentenced under § 2S1.1(a)(1). The Ninth Circuit reversed, reasoning that they "were convicted of conspiracy, an inchoate crime which does not require commission of the underlying offense," that they "did not admit guilt on the substantive crimes," and that the Government therefore "must rely on relevant conduct" to satisfy (a)(1)(A) — which it could not, because the underlying fraud occurred abroad. *Id.* at 992. Following *Azeem*, the court remanded "for resentencing under § 2S1.1(a)(2)." *Id.* The same analysis applies here: Petitioner stands convicted of conspiracy under § 1349, never of substantive wire or mail fraud, and the underlying frauds occurred in Ghana. *See* Ground Six, *supra*.

14740649.1.80-120

### C. The Guidelines Consequences

Applying § 2S1.1(a)(2), and accepting the Government's own $11.74 million figure as the value of laundered funds: base offense level 8; plus 20 under the § 2B1.1 table; plus 2 under § 2S1.1(b)(2)(B); plus 2 under § 3A1.1(b). Total offense level 32 — range 121 to 151 months at Criminal History Category I.

Combining this ground with Ground Ten (traced loss rather than gross deposits) and Ground Nine (no vulnerable-victim adjustment), the calculation becomes: base 8; plus the table increment corresponding to the traced figure; plus 2 under § 2S1.1(b)(2)(B). At the figure the Government used for Freeman on materially identical proof — funds actually traced to identified victims — the increment is 14, yielding offense level 24 and a range of **51 to 63 months**.

### D. Prejudice

The range as calculated was 210 to 262 months. Under (a)(2) alone it is 121 to 151. Under (a)(2) with the corrections in Grounds Nine through Eleven it is 51 to 63. The 156-month sentence exceeds the top of both corrected ranges — by five months and by ninety-three months respectively.

This is not a case in which the Court would have been required to guess at the counterfactual. The identical guideline was applied to the identical role by the same prosecuting office in the companion case, and produced a base offense level of eight. Under *Glover*, any additional time is prejudice; under *Molina-Martinez*, the incorrect anchor is presumed to have affected the sentence. Counsel raised nothing. Appellate counsel was also ineffective in failing to raise the misapplication of § 2S1.1 on plain-error review. An unpreserved Guidelines error is reviewable under *United States v. Olano*, 507 U.S. 725, 732-36 (1993), and *Molina-Martinez v.*

14740649.1.81-120

*United States*, 578 U.S. 189, 198 (2016), holds that an incorrect range will ordinarily satisfy the substantial-rights prong.

## GROUND NINE: COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE VULNERABLE-VICTIM ENHANCEMENT

### A. The Standard

Section 3A1.1(b) adds two levels "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim" — one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." § 3A1.1 cmt. n.2.

The commentary cabins the enhancement with two examples. It applies "in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim" — cases of *targeting*. But "it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." *Id.* As the Seventh Circuit observed, since "the whole idea of fraud is to prey on the vulnerable," it "would be *de trop*" to apply the enhancement in every fraud case. *United States v. Newman*, 965 F.2d 206, 213 (7th Cir. 1992).

Courts accordingly require a nexus and particularized findings: the enhancement applies where "(1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner." *United States v. Zats*, 298 F.3d 182, 186 (3d Cir. 2002). "[A]pplying the vulnerable victim adjustment requires a fact-based explanation of why advanced age or some other characteristic made one or more

14740649.1.82-120

victims unusually vulnerable to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability." *United States v. Llamas*, 599 F.3d 381, 388 (4th Cir. 2010). This Circuit has vacated the enhancement for want of such findings. *United States v. Kerley*, 544 F.3d 172, 177-81 (2d Cir. 2008).

**B. Counsel Made the Factual Objection Without Making the Legal One**

What makes this omission particularly egregious is that counsel *did* argue the underlying facts — she simply never converted them into a Guidelines objection. At the sentencing hearing she told the Court that Petitioner "was never accused much less convicted of personally contacting individual victims and misrepresenting that he was either somebody expecting an inheritance or had a sick child or anything like that"; that "the implication was that he never personally reached out to these victims and misrepresented who he was"; that "[t]hey all sent checks to his name and his company"; and that "he was not the individual finding these people or contacting them." (Sent. Tr. 4-5.)

Every one of those statements is the factual predicate for a § 3A1.1(b) objection. Counsel articulated the premise and never stated the conclusion. She told the Court that Petitioner never selected, contacted, or communicated with a victim — and then confirmed that she had no unresolved objection to the two-level enhancement premised on his knowledge of a victim's characteristics. That is not a strategic choice between competing arguments. It is a failure to recognize that the argument she was making had a Guidelines consequence.

**C. Application**

The PSR grounded the enhancement on a single victim, M.S., who was confined to a wheelchair, asserting Petitioner knew of the disability. (PSR ¶ 33.) Three defects went unraised.

14740649.1.83-120

*First*, no nexus. Nothing shows that M.S.'s use of a wheelchair facilitated the fraud. The scheme was executed online and by telephone; mobility impairment did not make M.S. more susceptible to a romance scam. *United States v. Monostra*, 125 F.3d 183, 189-91 (3d Cir. 1997), is directly on point: the court reversed where the defendant's supervisor was blind, because there was no evidence the victim "would have been less vulnerable if he could have seen." One need not be ambulatory to monitor one's finances.

*Second*, no targeting. The Government's theory was that the "Fraud Boys" contacted members of the general public online without regard to physical condition. That is the commentary's excluded example.

*Third*, no knowledge. Section 3A1.1(b) requires that *the defendant* knew or should have known. Petitioner never spoke with M.S., never saw M.S., and was never told anything about M.S. The Government identified no communication in which any co-conspirator described a victim's physical condition to him. Boateng — the only witness who could have supplied such a link — had never heard of him. "There is nothing in the record that would so much as suggest, let alone demonstrate by a preponderance of the evidence, that [the defendant] should have known about [the victim's] condition." *United States v. Myers*, 481 F.3d 1107, 1111 (8th Cir. 2007); accord *Kerley*, 544 F.3d at 180-81.

**D. The Related Cases Confirm the Objection Would Have Succeeded**

This is not speculation. As set out in Part I.F, *supra*, when the Government advanced the identical theory as to Asante — that launderers know romance frauds are "endemic" — Judge Rakoff rejected it: "That sounds too vague to me," and "I don't think there is evidence that he knew about the romance emotional aspects of the fraud." (*Asante* Sent. Tr. 14, 21.) When it

14740649.1.84-120

advanced the theory as to Freeman, the same Court found "there was not enough evidence . . . to conclude that this defendant had more than, at best, a very generalized knowledge of what was going on in those situations. That wasn't his role. His role was money laundering." (*Freeman* Sent. Tr. 26.) Neither received the adjustment.

Petitioner's position is stronger than either. Asante was sent victims' driver's licenses and coached a co-conspirator on how a victim should talk to a bank; Petitioner was shown to have done nothing of the kind. Freeman called the fraudsters "my boys"; no such evidence exists here. And the Government's own summation in this case told the jury that speaking to victims "wasn't" Petitioner's job — that it was the fraud boys who "are speaking to the victims" and "telling the victims that they are in love with them." (Tr. 346-47.)

**E. Prejudice**

The two levels are prejudice under *Glover* standing alone. But again the cascading effect is greater: § 4C1.1(a)(9) categorically disqualifies from the zero-point-offender reduction any defendant who "receive[d] an adjustment under § 3A1.1." The unchallenged two-level enhancement therefore cost Petitioner four levels — the two of the adjustment itself and the two of the reduction it forecloses — and rendered him ineligible for the very relief that reduced Freeman's sentence by fifteen months. Appellate counsel was independently ineffective in failing to challenge the enhancement on plain-error review, where the absence of any finding on nexus, targeting, or knowledge is apparent from the sentencing transcript. *See United States v. Kerley*, 544 F.3d 172, 177-81 (2d Cir. 2008).

**GROUND TEN: COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE LOSS CALCULATION UNDER § 2B1.1**

14740649.1.65-120

**A. Loss Means Traced Victim Loss, Not Gross Deposits**

"Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). The Government bears the burden of proving loss by a preponderance and must support the calculation with reliable and specific evidence. Gross deposits into a launderer's account are not loss; they are the raw input to a tracing analysis.

This Circuit requires particularized findings before co-conspirator conduct may be attributed to a defendant at sentencing. "Before sentencing a defendant based on the conduct of co-conspirators, a district court is required to make two particularized findings: (1) that the scope of the activity to which the defendant agreed was sufficiently broad to include the relevant, co-conspirator conduct in question; and (2) that the relevant conduct on the part of the co-conspirator was foreseeable to the defendant." *United States v. Getto*, 729 F.3d 221, 234 (2d Cir. 2013); *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995). "[T]he scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991).

**B. The Government Substituted Deposits for Loss**

The PSR applied a 20-level increase under § 2B1.1(b)(1)(K) for loss exceeding $9.5 million, using $11,744,115.07. The Government's sentencing memorandum states in terms that this figure "represents the total **deposits** into the Ganiyu Business Accounts." (Gov't Mem. 19 n.11.) It performed no tracing analysis. It identified "more than 40 victims" whose payments it could trace; the aggregate of those identified losses is the restitution figure this Court ordered — $7,675,785.32.

14740649.1.66-120

The Government's own filings demonstrate that it knows the difference and applies it when it chooses. Discussing Asante in *this* case's sentencing memorandum, it stated that of $36.24 million in deposits, "only $6.7 million was traced to identified fraud proceeds." (Gov't Mem. 20.) At Asante's own sentencing it told Judge Rakoff: "We've identified $35,000,000 in deposits over that time period and have been able to specifically identify about $6,000,000 in fraud." (*Asante* Sent. Tr. 16.) And for Freeman — whose accounts received "deposits totaling approximately $5.8 million dollars" — the Government calculated the guideline on "approximately $2.5 million in fraud proceeds," applying the table increment for funds "more than $1,500,000 but less than $3,500,000." (Dkt. 126 at 11, 13; Dkt. 125 at 3.)

In every related case, the Government used traced proceeds. In this case alone it used gross deposits. The difference is that in every related case, defense counsel objected.

**C. What Competent Counsel Did in the Companion Cases**

Freeman's counsel did precisely what Petitioner's counsel did not. She reviewed the bank records admitted at trial "for references or notations that might indicate suspicious transactions" and produced a victim-by-victim table — twenty-two named individuals with the amount attributable to each — totaling **$1,179,966.00**, which she offered as "a more accurate calculation of the funds which were obtained under false pretenses and deposited into Mr. Freeman's accounts." (Dkt. 125 at 4.) This objection did its work: the Court explained that "one of the reasons I pay no attention to the guidelines in this area is because it so overemphasizes the loss calculation," and it went on to impose a sentence at the bottom of the range. (*Freeman* Sent. Tr. 3 -4.) The point is not that every such objection succeeds. It is that a preserved objection forces the Court to engage with the figure and frames the § 3553(a) analysis that follows. Petitioner's counsel made no objection at all, and this Court was never given occasion to consider whether

14740649.1.87-120

the loss figure overstated his conduct. She cross-examined the FBI forensic accountant and established the foundation for the objection:

> Q. You showed a number of slides showing about 66 people who deposited money into the accounts; is that right?
> A. Yes.
> Q. And did you speak to any of those people?
> A. No.
> Q. You don't know the reasons behind those numbers?
> A. That's correct, I do not know the reasons.

(Freeman Trial Tr. 374-75.) She then argued that "[t]he government produced no law enforcement witness to testify that they 'identified approximately $2.3 million in fraud proceeds ... from approximately 80 people....' That is pure speculation." (Dkt. 125 at 4.) Asante's counsel likewise attacked the loss-driven Guidelines directly, arguing that although the calculation was arithmetically correct "it does not accurately reflect the severity of Mr. Asante's offense conduct," and that "Mr. Asante was not personally involved in defrauding victims." (Dkt. 112 at 5.)

Both invoked the controlling Second Circuit authority that Petitioner's counsel never cited. In *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016), this Circuit held: "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.* at 800. The court remanded to permit that consideration where a base offense level of six had been inflated by the loss table. That is this case exactly: a base offense level of 7 (or 8 under § 2S1.1(a)(2)) inflated twenty levels by loss.

Asante's counsel paired *Algahaim* with Judge Rakoff's own decisions. In *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014), the court wrote: "The notion that this complicated analysis, and moral responsibility, can be reduced to the

14740649.1.88-120

mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense." In *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), the court criticized "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss . . . without, however, explaining why it is appropriate to accord such huge weight to such factors" — and imposed 42 months where the loss was between $50 and $100 million. *See also United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("the amount of loss caused by this crime is a kind of accident, dependent as much on the diligence of the victim's security procedures as on [the defendant's] cupidity").

**D. Foreign Losses and Petitioner's Absences**

Two further defects went unraised. *First*, the record indicates that only approximately $5.9 million of the deposits originated from United States sources. Because neither the wire fraud statute nor the conspiracy statute applies extraterritorially, the losses underlying the offense of conviction are those attributable to the misuse of American wires. *See* Ground Six, *supra*; *United States v. Azeem*, 946 F.2d 13, 16-17 (2d Cir. 1991).

*Second*, Petitioner was outside the United States from December 24, 2020 to August 16, 2021, and again from January 12, 2022 to July 4, 2022 — approximately fourteen months of the twenty-nine-month charged period. The Government never proved that he directed, authorized, or was aware of particular deposits made during those absences. Under *Studley* and *Getto*, those amounts required individualized findings of scope and foreseeability before attribution. None were made, because no objection was raised.

**E. Deficient Performance**

14740649.1.89-120

There was no strategy in conceding twenty offense levels. Counsel obtained nothing in exchange; her entire mitigation case was MDC conditions. The objection required no investigation beyond documents already in her possession — the Government's own memorandum, which identified the figure as gross deposits, and the restitution order, which identified the traced total. And the roadmap had been filed publicly on a docket in this District two years earlier by counsel for two more culpable defendants.

**F. Prejudice**

Had counsel objected, the Government would have borne its burden at a *Fatico* hearing. *See United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979). It would have had to identify which deposits were traced to victims, which originated domestically, and which fell within the scope of Petitioner's agreement. On this record it could not have exceeded the $7.68 million it identified, and quite possibly not that.

At $7,675,785.32, § 2B1.1(b)(1)(J) adds 18 levels rather than 20 — offense level 35 and a range of 168-210 months under the PSR's framework. Under Ground Eight's (a)(2) framework the level falls further. Confining loss to funds actually traced to identified victims, as the Government did for Freeman, produces the 14-level increment, offense level 24, and a range of 51 to 63 months. Under *Glover*, each of these differences is prejudice; under *Molina-Martinez*, the incorrect anchor is presumed to have affected the sentence. This Court expressly reasoned from the 210-262 range. Appellate counsel was likewise ineffective in failing to raise the loss calculation on plain-error review. The error is established by the Government's own submission, which identifies the figure as gross deposits, and by the restitution order, both of which were in the appellate record.

14740649.1.90-120

## GROUND ELEVEN: COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE FOUR-LEVEL SUBSTANTIAL-FINANCIAL-HARDSHIP ENHANCEMENT

### A. The Enhancement Requires Victim-Specific Proof

Section 2B1.1(b)(2)(B) adds four levels if the offense "resulted in substantial financial hardship to five or more victims." Added in 2015, it was designed to "place greater emphasis on the extent of harm that particular victims suffer as a result of the offense" rather than merely counting victims. 80 Fed. Reg. 25,782, 25,791 (May 5, 2015).

Application Note 4(F) directs the court to consider whether the offense resulted in the victim becoming insolvent; filing for bankruptcy; suffering substantial loss of a retirement, education, or other savings fund; making substantial changes to employment; making substantial changes to living arrangements; or suffering substantial harm to the ability to obtain credit. The inquiry is victim-specific and relative. *United States v. Minhas*, 850 F.3d 873, 877 (7th Cir. 2017) ("[t]he same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup"); *United States v. George*, 949 F.3d 1181, 1185-86 (9th Cir. 2020); *United States v. Castaneda-Pozo*, 877 F.3d 1249, 1252 (11th Cir. 2017).

Total loss cannot substitute for hardship. "[T]he loss table in § 2B1.1(b)(1) already accounts for these concerns. The substantial-hardship enhancement in § 2B1.1(b)(2) captures something different." "It would be clear error for a district judge, for example, merely to divide a total loss amount by the number of victims without any information about the amount each individual victim suffered or the victim's financial circumstances." *Minhas*, 850 F.3d at 878. The Fifth Circuit recently vacated a substantial-hardship enhancement on exactly this ground, holding that the district court erred by "rest[ing] the enhancement on total loss alone" without assessing whether the loss "significantly impact[ed] the victim's resources" for each required victim.

14740649.1.91-120

*United States v. Day*, No. 23-50636 (5th Cir. Sept. 16, 2024).

**B. The "Personally Caused" Requirement and the Related Cases**

The Sentencing Commission's parallel treatment of financial hardship in U.S.S.G. § 4C1.1(a)(6) confirms that a downstream launderer does not cause the hardship the enhancement targets. Section 4C1.1(a)(6) disqualifies a zero-point offender only where "the defendant did not **personally cause** substantial financial hardship." The Commission's deliberate use of "personally" — a word absent from § 4C1.1(a)(3) and (a)(7) — reflects a judgment that "[c]ausing substantial financial hardship . . . often requires more than one person, each performing one or more acts that ultimately cause the financial hardship," and that "by excluding only those defendants who 'personally caused' the financial hardship, the Sentencing Commission ensures that defendants who acted as 'middleman' or had minor links in the causation chain, are still eligible."

Courts have applied that principle to launderers in fraud conspiracies. In *United States v. Elendu*, No. 20-CR-179-14 (DLC), 2024 WL 458643, at *3 (S.D.N.Y. Feb. 6, 2024), Judge Cote observed that the defendant's "money laundering activity as a member of a conspiracy that defrauded individuals and businesses would not disqualify him since he did not 'personally cause' substantial financial hardship to the victims of the fraud in which he participated."* See also United States v. Daramola, *2024 WL 4241840, at* 5 (D.N.M. Sept. 19, 2024) ("defendants personally cause substantial financial hardship ONLY when they are directly involved in defrauding the victim, not when they act as middleman in a fraudulent conspiracy"); *cf. United States v. Bentley*, 2024 WL 3796181, at *1 (S.D. Tex. Aug. 13, 2024) (enhancement appropriate where "[d]efendant's personal actions in defrauding his investors caused substantial financial hardship").

14740649.1.92-120

Most tellingly, Freeman's counsel made exactly this argument in the companion case: "Mr. Freeman did not personally cause substantial financial hardship to any of the victims. . . . [I]t is undisputed that he did not personally engage with the victims of the romance scams. His role, rather, was facilitating the transfers of money from the victims to other persons or agencies." (Dkt. 147 at 4, quoting *Elendu*.) **The Government did not dispute it.** (Dkt. 151.) The Court granted relief.

**C. Application**

The enhancement was applied here without any victim-by-victim analysis. The record contains victim impact statements describing serious harm in general terms, but the Court made no findings identifying five victims, describing their financial circumstances, or connecting particular losses to any Note 4(F) factor. It was not asked to. Counsel represented that there were no material unresolved objections.

There is a second, independent defect: under § 2S1.1(a)(2) — the guideline that should have governed, *see* Ground Eight — this enhancement does not apply at all, because it is a specific offense characteristic of § 2B1.1 rather than a component of the loss table. *Pratt*, 728 F.3d at 481. Neither Asante nor Freeman received it. The four levels were unavailable twice over.

**D. Prejudice**

The four levels are the difference between offense level 37 and offense level 33 — between 210-262 months and 135-168 months — standing alone. But the greater injury is the cascading one. Because § 4C1.1(a)(6) disqualifies a defendant who personally caused substantial financial hardship, the unchallenged enhancement also forecloses Petitioner from the two-level zero-point-offender reduction. Freeman received that reduction, and his sentence went from 78

14740649.1.93-120

months to 63 months. Petitioner — with no criminal history, no victim contact, and no finding that he ever gave false testimony — is barred from it solely because his counsel did not make the objection Freeman's counsel made and the Government did not oppose. Appellate counsel was independently ineffective in failing to raise the absence of victim-specific findings on plain-error review.

## GROUND TWELVE: COUNSEL WAS INEFFECTIVE IN FAILING TO ARGUE SENTENCING DISPARITY AND DEPORTATION CONSEQUENCES

### A. The Comparators Were Public and Available

Section 3553(a)(6) directs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The comparators here were not obscure. They were in the Government's own sentencing memorandum in this case, which discussed Asante by name and disclosed his $36.24 million in deposits, his $6.7 million in traced proceeds, and his 108-month sentence. And they were on a public docket in this District — *United States v. Appiedu*, No. 21-cr-00088 (JSR) — in cases that had concluded years earlier.

Aning was sentenced February 28, 2022. Asante was sentenced May 18, 2022. Freeman was sentenced October 20, 2022 and resentenced May 1, 2024. Petitioner was sentenced November 18, 2024 — more than two and a half years after Asante, more than two years after Freeman, and more than six months after Freeman's Amendment 821 reduction. Every sentencing submission, transcript, and judgment was available on ECF. There was no excuse for counsel not to have reviewed them.

14740649.1.94-120

**B. What the Record Would Have Shown**

The Government described Asante as "a **central co-conspirator**" and "the top U.S.-based money launderer" for the Enterprise. It stated that "**Asante was the largest withdrawal recipient**" from the accounts at issue and that **Asante used Ganiyu's accounts** — that is, Petitioner was a downstream feeder to Asante, not his peer. (Gov't Mem. 19-20.) It called Asante "by far the most culpable defendant of anyone who has been charged in this case or any related cases," a defendant with "substantial criminal history" in Criminal History Category III who had spent "almost half" of twenty-five years "either committing serious federal crimes or serving time in prison." (Gov't Asante Mem. 6-7.) Judge Rakoff called him "a master at money laundering" who "hadn't learned his lesson." (*Asante* Sent. Tr. 4, 21.)

The Government asked for **120 months** for Asante. It asked for **120 months** for Petitioner. Asante received 108. Petitioner received 156.

Freeman — "one of the top U.S.-based money launderers for the Enterprise" and "one of the most culpable defendants to be sentenced" — was convicted at trial on seven counts, was found by the sentencing court to have lied repeatedly under oath, and received 78 months, later reduced to 63 months.

**C. The Internal Inconsistency**

This Court stated that it varied downward "in part to avoid otherwise unwarranted sentencing disparities, as explained in the government's sentencing submission." (Sent. Tr. 10.) But the Government's submission identified Asante — with four times the deposits, a serious criminal record, and a leadership role — as the benchmark, and requested 120 months on that basis. A sentence forty-eight months above what the benchmark defendant received, and thirty-

14740649.1.95-120

six months above what the Government requested, does not remedy the disparity the Court invoked as its reason for varying.

Counsel never identified this inconsistency. She never mentioned Asante at allocution. She never mentioned Asante, Freeman, or Aning in her written submission. She "rel[ied] on [her] submission" (Sent. Tr. 6) — a submission addressing MDC conditions and nothing else.

**D. Prejudice**

The argument counsel failed to make was not merely "Asante got less." It was that the Government had itself proposed 120 months as the parity figure for the most culpable defendant in the enterprise; that the Court invoked parity as its express reason for varying; and that the sentence imposed was inconsistent with that stated rationale. A defendant is entitled to counsel who will hold the court to its own reasoning. Appellate counsel was also ineffective in failing to raise the substantive and procedural unreasonableness of the sentence on plain-error review, including the internal inconsistency between the Court's stated disparity rationale and the sentence imposed.

This ground also compounds Grounds Eight through Eleven. Had counsel established that Petitioner was a third-party launderer under § 2S1.1(a)(2) — as the Government itself calculated for Freeman — the Asante and Freeman comparisons would have carried a Guidelines anchor rather than resting on bare comparison. A defendant with no criminal history, sentenced under the same guideline as Freeman, on traced-loss figures, without the two enhancements neither comparator received, would have faced 51 to 63 months. The Court's stated intention to vary downward for MDC conditions would then have operated on that range.

14740649.1.96-120

**E. A Related Failure: Counsel Did Not Argue That Deportation Consequences Warranted a Downward Variance**

Counsel's failure to investigate Petitioner's immigration status, addressed in Ground Seven, produced a second, independent forfeiture at sentencing. She never argued that the certainty of removal following a lengthy sentence was a mitigating circumstance under 18 U.S.C. § 3553(a).

That argument is settled law in this Circuit. In *United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014), the Second Circuit held that in "determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may consider the uncertainties presented by the prospect of deportation proceedings and the impact deportation will have on the defendant and his family." Accord *United States v. Wills*, 476 F.3d 103, 107 (2d Cir. 2007).

Counsel for Celvin Freeman made precisely this argument to Judge Rakoff. She opened her sentencing memorandum with a section captioned "The Effect of Deportation on Sentence," quoted *Thavaraja*, and argued that because removal was certain regardless of the sentence imposed, "any amount of time served in prison, in addition to the years he spent incarcerated before trial, would not serve any useful purpose" and "would merely run up the costs to the American taxpayer." (Dkt. 125 at 1-2.) She returned to the point in arguing deterrence: "because he will be deported, any sentence imposed will afford adequate deterrence." (*Id.* at 8-9.)

Freeman made that argument from a markedly weaker position than Petitioner's. Freeman had been unlawfully present in the United States since his work visa expired in 2015; his family lived in Ghana; and his counsel candidly told the Court that he was "prepared for the fact of deportation, and would like to be deported as soon as possible." (Dkt. 125 at 5.) Petitioner, by

14740649.1.97-120

contrast, is a lawful permanent resident since 2012 whose two minor children are United States citizens and whose late parents were United States citizens. If deportation was a mitigating consideration for a defendant with no lawful status and no family here, it was a considerably weightier one for a lawful permanent resident who will be separated from citizen children.

Counsel for Fred Asante likewise devoted the mitigation portion of his submission to the § 3553(a) factors that the Probation Office had overlooked — the harshness of pandemic-era pretrial detention, the defendant's community ties, and the distorting effect of the loss table, which "accounts for more than half of his 30 offense points" and "renders the Guidelines calculation an unreliable indicator as to the appropriate sentence." (Dkt. 112 at 2.) Petitioner's counsel argued only MDC conditions, and made no argument at all concerning his client's family circumstances, his lawful status, or the collateral consequences of the sentence.

*Prejudice.* Judge Rakoff imposed sentences below the Government's request in both companion cases after hearing these arguments. This Court expressly stated that it was varying downward and identified two reasons for doing so. A third mitigating consideration, supported by binding Circuit authority and by the fact that Petitioner's United States citizen children would be separated from their father, was available and was never presented. Its omission is prejudice under *Glover*.

14740649.1.98-120

**GROUND THIRTEEN: CUMULATIVE PREJUDICE**

Petitioner does not present cumulative prejudice as a separate ground for relief but as the framework through which the foregoing grounds must be assessed. Where counsel commits multiple errors, prejudice is measured by their combined effect. *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001), granted relief on precisely that basis, holding that "the combined weight" of counsel's errors warranted the writ even though "each alone might not" have. Accord *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991).

The pattern here is not a handful of isolated missteps. Counsel filed no suppression motion despite written notice from the Government that agents had searched her client's phones without a warrant and despite a decision of this District holding such searches unconstitutional. She stipulated to virtually every exhibit and made fewer than ten objections across three days of trial. She objected once to co-conspirator hearsay, obtained a conditional ruling, and never sought the finding or moved to strike. She argued in summation that the Government's own cooperator had never heard of her client but never requested the instruction that would have let the jury act on it. She moved for acquittal in one sentence and, given two express invitations to specify grounds, declined both.

At sentencing she conceded every enhancement. She did not contest a loss figure the Government's own footnote identified as gross deposits. She did not argue that her client — whom she herself described as the getaway driver — was a third-party launderer under a guideline written for exactly that defendant, and which the same prosecuting office had applied to a more culpable co-launderer convicted on seven counts. She stated the factual predicate for a vulnerable-victim objection and never made the objection. She did not read the docket in the companion case. She did not correct the Government's misstatement that her client had

14740649.1.99-120

communicated directly with a victim. She did not notice that the Court had orally pronounced a sentence on Count Four exceeding the statutory maximum. Her entire mitigation case was the condition of the MDC.

Appellate counsel then omitted the one claim that could have produced an acquittal.

The combined effect is measurable. Eight offense levels separate the sentence Petitioner received from the sentence a properly counseled defendant would have faced — the difference between 210-262 months and 51-63 months. That gap is not the product of any single error. It is the product of a proceeding in which, at the stage that mattered most, no adversarial testing occurred at all. Considered cumulatively, counsel's errors undermine confidence in both the verdict and the sentence. *Strickland*, 466 U.S. at 685-86.

## PART IV. AN EVIDENTIARY HEARING AND APPOINTMENT OF COUNSEL ARE WARRANTED

### A. Hearing

Section 2255(b) requires a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." The Second Circuit construes this generously: a petitioner need only establish a "plausible" claim, not that he will prevail. *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009). "[T]he threshold for showing entitlement to a hearing is lower than that for succeeding on the merits." *Id.* Where a claim depends on matters outside the record — particularly attorney-client communications — a hearing is ordinarily required. *Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001); *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011).

Several grounds cannot be resolved on the papers. Ground Seven turns entirely on what

14740649.1.100-120

advice Petitioner received in December 2023 and early January 2024 — matters known only to Petitioner and his then-counsel, and addressed in his accompanying declaration. Ground Four turns in part on whether counsel was aware of *Smith* and why no motion was filed. Grounds Eight through Eleven turn in part on whether counsel conducted any Guidelines research or reviewed the companion docket. Ground One turns on appellate counsel's reasons for omitting the sufficiency claim. By raising these claims Petitioner waives the attorney-client privilege to the extent necessary to permit former counsel to respond.

**B. Appointment of Counsel**

Rule 8(c) of the Rules Governing § 2255 Proceedings provides that if an evidentiary hearing is warranted, "the judge must appoint an attorney to represent a moving party who qualifies to have counsel appointed under 18 U.S.C. § 3006A." Petitioner is indigent, incarcerated at FCI Allenwood Low, and was represented by appointed counsel on direct appeal. He has no legal training and no meaningful access to the trial exhibits, the sealed PSR, or the co-defendant records that Grounds Eight through Twelve require. Should this Court order a hearing, Petitioner respectfully requests appointment of counsel under Rule 8(c) and § 3006A(a)(2)(B).

**CONCLUSION**

For the foregoing reasons, Petitioner respectfully requests that this Court: (1) vacate his convictions on Counts One, Two, and Three; (2) vacate the sentence and resentence him under a correctly calculated Guidelines range; or in the alternative (3) grant relief on Ground Seven by directing the Government to re-offer the December 28, 2023 plea agreement, *see Lafler*, 566 U.S. at 170-71; (4) order an evidentiary hearing on Grounds One, Four, Seven, and Eight through Eleven; (5) appoint counsel pursuant to Rule 8(c); and (6) grant such other relief as the Court

14740649.1.101-120

deems just and proper.

Should the Court deny relief in whole or in part, Petitioner respectfully requests a certificate of appealability under 28 U.S.C. § 2253(c)(2) on the ground that reasonable jurists would find debatable the resolution of the sentencing claims in Grounds Eight through Twelve, the plea-advice claim in Ground Seven, and the appellate-counsel claim in Ground One. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Dated: August 28, 2026

Respectfully submitted,

Bashiru Ganiyu, Pro Se
Reg. No. 69417-054
FCI Allenwood Low
P.O. Box 1000
White Deer, PA 17887

14740649.1.102-120

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

BASHIRU GANIYU,

Petitioner,

v.

Crim. No. 23-cr-00331 (LAK)

UNITED STATES OF AMERICA,

Respondent.

**DECLARATION OF BASHIRU GANIYU**

**IN SUPPORT OF MOTION UNDER 28 U.S.C. § 2255**

I, Bashiru Ganiyu, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

**I. Background**

1. I am the Petitioner in this action. I am currently incarcerated at FCI Allenwood Low, P.O. Box 1000, White Deer, Pennsylvania 17887, Register No. 69417-054, serving the 156-month sentence imposed by this Court on November 18, 2024.

2. I make this declaration from personal knowledge in support of my motion under 28 U.S.C. § 2255. I am not a lawyer. I have no legal training. Everything stated here is what I personally saw, heard, said, or was told.

3. By making the statements in this declaration, I understand that I am waiving the attorney-

14740649.1.103-120

client privilege as to my former attorneys, but only to the extent necessary to allow them to respond to the specific claims raised in my motion. I do not intend to waive the privilege for any other purpose.

**II. Facts Relating to Ground Seven — The Plea Offer and Immigration Consequences**

4. On or about December 28, 2023, the Government made a written plea offer in my case. My attorney told me that the Government would allow me to plead guilty to one count of receiving stolen property under 18 U.S.C. § 2315. He told me the sentencing guideline range in the offer was 46 to 57 months.

5. My attorney did not tell me what sentence I would face if I lost at trial. He never told me any number. He never used the words "210 months" or "262 months" or any range close to those figures. He never told me that the sentencing guidelines after a trial could be four or five times the offer.

6. My attorney never told me that Count One (conspiracy to commit wire fraud and mail fraud) and Count Two (money laundering conspiracy) each carried a maximum sentence of twenty years. I did not know that. I believed that the charges against me all carried roughly the same exposure as the § 2315 count in the offer, which I was told had a ten-year maximum.

7. My attorney never told me that the Government would ask for a "vulnerable victim" enhancement or a "substantial financial hardship" enhancement.

8. My attorney never told me that other people accused of doing the same thing I was accused of — receiving money from the same fraud operation in Ghana — had already been prosecuted in this same courthouse. He never mentioned the names Fred Asante, Celvin Freeman, Lord Aning,

14740649.1.104-120

or Farouk Appiedu. He never told me that their case was called *United States v. Appiedu*, No. 21 -cr-00088, or that it was before Judge Rakoff. He never told me what sentences any of them received.

9. If my attorney had told me, in December 2023 or early January 2024, that (a) my guideline range after a trial would be 210 to 262 months; (b) Counts One and Two each carried a twenty-year maximum; and (c) the most culpable person in the entire operation had received 108 months, I would have accepted the plea offer of 46 to 57 months. I would have accepted it without hesitation.

10. I have no prior criminal convictions. I had no criminal history points at sentencing.

11. I am a lawful permanent resident of the United States. I received my green card in 2012 and have held it ever since.

12. My mother and my father were both United States citizens. Both are now deceased.

13. I have two minor children. Both of my children are United States citizens and both live in the United States.

14. Neither Mr. Elman nor Ms. Heller ever asked me about my immigration status. Neither of them ever asked whether I was a citizen, a lawful permanent resident, or anything else. The subject never came up.

15. Neither of my attorneys ever told me that a conviction in this case could result in my deportation. Neither of them ever used the word "deportation" or the word "removal" in any conversation with me.

16. Neither of my attorneys ever asked me about my family. Neither asked whether I had

14740649.1.105-120

children, whether my children were United States citizens, or what would happen to them if I were removed from the country.

17. Nobody ever discussed with me the possibility of asking the Government for a different plea — one to a different charge, or with a shorter agreed sentence — so that I could avoid mandatory deportation and stay with my children. I did not know that was something a lawyer could try to do.

18. Deportation matters enormously to me. My children are here. My parents lived and died here. I have built my adult life in this country lawfully since 2012. If my attorney had told me that a conviction would mean I would be deported and permanently separated from my children, that would have changed how I thought about my case.

19. If my attorney had told me that the plea offer would make my deportation mandatory, I would have asked him to try to negotiate something different — a different charge, or a shorter sentence — that would let me stay with my children. If no such alternative had been available, I would still have accepted the 46-to-57-month offer, because after a trial I faced both a much longer sentence and the very same deportation.

**III. Facts Relating to Ground Four — The Airport Search**

20. On August 16, 2021, I returned to the United States from Accra, Ghana, and landed at John F. Kennedy International Airport. Officers took me to a secondary inspection area.

21. When the officers took me to the secondary inspection area, they told me that they were conducting an investigation into child pornography. That is the reason they gave me for stopping me and for wanting to look at my devices. I was shocked and I wanted to clear my name

14740649.1.106-120

immediately, because I have never had anything to do with anything like that. That is why I unlocked my phones and gave them the passcodes.

22. Nobody told me that the real purpose of the search was to look for evidence about my bank accounts or about the money that had come into my business. Had I known that the true purpose of the search was to gather evidence to charge me with the crimes in this case, I would not have consented to the search of my devices. I would have said no and asked for a lawyer.

23. I was carrying two cellular telephones and one tablet. The officers asked me for the passcodes. I gave them the passcodes. I did not know I had a right to refuse. Nobody told me I had such a right. Nobody showed me a warrant.

24. The officers took my phones and looked through them. I could see them scrolling through my photographs and my messages. This continued for a period of time while I waited.

25. At my trial, the Government introduced photographs that had been taken from my phone during that search, including a photograph of a cashier's check and a photograph of a FedEx envelope.

26. Neither Mr. Elman nor Ms. Heller ever told me that the search of my phones might have been illegal. Neither of them ever discussed with me the possibility of filing a motion to suppress the evidence taken from my phones. I was never asked any questions about what happened at the airport for the purpose of preparing such a motion. To my knowledge, no motion to suppress was ever filed in my case.

**IV. Facts Relating to Grounds One, Two, and Three — Trial**

27. I have never met, spoken to, corresponded with, or done business with Samuel Boateng. I

14740649.1.107-120

had never heard his name before this case. When he testified at my trial that he had never heard of me and had never heard of Gani, LLC, he was telling the truth.

28. I have never met, spoken to, corresponded with, or done business with Fred Asante, Celvin Freeman, Lord Aning, or Farouk Appiedu.

29. I never spoke with Dennis Powell, James Von Allmen, Paul Gruszecki, Charles Jones, or any other person identified at my trial as a victim. I never sent any of them a message of any kind. I never told anyone that I was in love with them, that I was expecting an inheritance, or that I had a sick child.

30. I opened every one of my business bank accounts in my own name, using my own address, my own telephone number, and my own identification. I did not use any alias.

31. I was outside the United States from December 24, 2020 to August 16, 2021, and again from January 12, 2022 to July 4, 2022. During those periods I did not direct anyone to deposit money into my accounts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 28, 2026, at White Deer, Pennsylvania.

Bashiru Ganiyu
Reg. No. 69417-054
FCI Allenwood Low
P.O. Box 1000
White Deer, PA 17887

14740649.1.108-120

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

BASHIRU GANIYU,

Petitioner,

v. Crim. No. 23-cr-00331 (LAK)

UNITED STATES OF AMERICA,

Respondent.

**MOTION FOR LEAVE TO FILE AN OVERLENGTH MEMORANDUM OF LAW PURSUANT TO LOCAL CIVIL RULE 7.1(c)**

Petitioner Bashiru Ganiyu, appearing pro se, respectfully moves this Court for leave to file a memorandum of law in support of his motion under 28 U.S.C. § 2255 that exceeds the word limitation of Local Civil Rule 7.1(c). Petitioner requests leave to file a memorandum not to exceed 23,000 words. In support of this motion, Petitioner states as follows.

**I. The Applicable Limit and the Relief Requested**

1. Local Civil Rule 7.1(c) of the Joint Local Rules of the United States District Courts for the Southern and Eastern Districts of New York limits memoranda of law in support of a motion to 8,750 words where the brief is prepared with a computer, and to 25 pages where the brief is filed by a party not represented by an attorney and is handwritten or prepared with a typewriter. The Rule permits a court to grant prior permission to exceed those limits.

14740649.1.109-120

2. Petitioner's memorandum of law is approximately 22,600 words. He therefore seeks leave to file a memorandum not to exceed 23,000 words, together with the accompanying declaration and exhibits, which under the Rule are excluded from the word count.

3. Petitioner has made every effort to be concise. He has removed material from earlier drafts, consolidated arguments, and cross-referenced rather than repeated. The length reflects the number of independent claims and the volume of record material each requires, not redundancy.

## II. Grounds for the Requested Enlargement

### *A. The number and independence of the claims*

4. The memorandum presents twelve separate grounds for relief, each requiring its own statement of the governing standard, its own application to the record, and its own prejudice analysis under *Strickland v. Washington*, 466 U.S. 668 (1984). The claims are not variations on a theme; they arise at four distinct stages — trial (a sufficiency claim and evidentiary and instructional failures), pretrial (failure to move to suppress), plea negotiation (*Lafler v. Cooper*, 566 U.S. 156 (2012), and *Padilla v. Kentucky*, 559 U.S. 356 (2010)), and sentencing (five separate Guidelines and § 3553(a) errors) — and the first arises from the conduct of appellate counsel on direct appeal.

5. Allocating the 8,750-word limit across twelve grounds would leave roughly 700 words per claim, before any statement of facts, statement of the standard of review, or discussion of timeliness and procedural default. That is not sufficient to present a claim on which a certificate of appealability may ultimately turn. Courts in this Circuit have recognized that a § 2255 movant must plead his claims with specificity or risk summary dismissal, *see Chang v. United States*, 250 F.3d 79, 85-86 (2d Cir. 2001), and Petitioner is caught between the obligation to plead fully

14740649.1.110-120

and the ordinary word limit.

*B. The factual complexity of a four-day trial and a contested sentencing*

6. Petitioner's claims require examination of a three-volume trial transcript, a sentencing transcript, a Presentence Report, the parties' sentencing submissions, a pretrial plea-rejection transcript, motions in limine, a Rule 29/33 motion and the order denying it, a search-warrant affidavit, and the briefs and summary order on direct appeal. Several claims — particularly the sufficiency claim in Ground One and the loss-calculation claim in Ground Ten — cannot be evaluated without setting out what each witness actually said.

*C. Multiple co-conspirators charged in separate cases*

7. This factor is unusual and warrants particular attention. The Government charged a single criminal enterprise across at least three separate prosecutions in this District: this case; *United States v. Appiedu*, No. 21-cr-00088 (JSR), in which Farouk Appiedu, Fred Asante, Celvin Freeman, and Lord Aning were charged together; and *United States v. Rufai*, No. 18-cr-00201 (DLC). Several of Petitioner's claims — Grounds Eight through Twelve — depend on comparing the Guidelines treatment and sentences of defendants prosecuted in those other cases.

8. Because those defendants were charged separately, the comparison cannot be made by citation to a single docket. It requires setting out, for each comparator, the Government's own characterization of his role, the Guidelines provision applied to him, the loss figure used, the enhancements imposed and not imposed, and the sentence received. That material occupies a substantial portion of the memorandum and a comparison table. It is also the single most probative evidence of *Strickland* prejudice in the case: it shows what a properly counseled defendant in Petitioner's position actually received. It further requires Petitioner to set out the

14740649.1.111-120

Guidelines provision the Government itself applied to a co-launderer convicted at trial on seven counts — a comparison that cannot be made in summary form.

### *D. Pro se status and limited access to legal resources*

9. Petitioner is incarcerated at FCI Allenwood Low. He has no legal training, no attorney, and limited access to legal research materials. The submissions of pro se litigants are held "to less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *accord Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and this Circuit requires that pro se filings be read "to raise the strongest arguments that they suggest," *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks omitted); *see also Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (applying liberal construction to a § 2255 motion).

10. A pro se litigant lacking the training to compress a legal argument to its essentials will necessarily use more words than counsel would. Denying leave would penalize Petitioner for the very circumstance that entitles him to solicitude. Notably, Local Civil Rule 7.1(c) itself recognizes that pro se litigants require different treatment, providing a separate page-based limit for pro se filers who do not use a computer.

### *E. The severity of the interest at stake and judicial economy*

11. Petitioner is serving a 156-month sentence. A § 2255 motion is ordinarily his single opportunity to obtain collateral review; a second or successive motion requires certification by the Court of Appeals under 28 U.S.C. § 2255(h). Claims omitted or truncated now are, for practical purposes, lost. That consideration weighs heavily in favor of permitting a complete presentation.

14740649.1.112-120

12. Granting leave will also conserve judicial resources. A single complete memorandum is easier for the Court and the Government to address than a truncated brief followed by motions to supplement, requests to expand the record, or amendments under Federal Rule of Civil Procedure 15. *See* Rule 12 of the Rules Governing § 2255 Proceedings (Federal Rules of Civil Procedure apply to the extent not inconsistent).

**III. No Prejudice to the Government**

13. The Government will suffer no prejudice. It has had access to the entire record since the underlying proceedings, and it prosecuted each of the related cases discussed in the memorandum. If the Court grants this motion, Petitioner does not oppose a corresponding enlargement of the word limit for the Government's response.

14. Petitioner has not previously sought an enlargement in this proceeding, and this request is made in advance of filing, as the Rule contemplates.

**CONCLUSION**

For the foregoing reasons, Petitioner respectfully requests that the Court grant leave to file a memorandum of law not to exceed 23,000 words in support of his motion under 28 U.S.C. § 2255, and grant such other relief as the Court deems just and proper.

Dated: August 28, 2026.

Respectfully submitted,

Bashiru Ganiyu, Pro Se
Reg. No. 69417-054
FCI Allenwood Low
P.O. Box 1000
White Deer, PA 17887

14740649.1.113-120

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

---

BASHIRU GANIYU,

Petitioner,

v. Crim. No. 23-cr-00331 (LAK)

UNITED STATES OF AMERICA,

Respondent.

---

**MOTION FOR LEAVE TO CONDUCT DISCOVERY**

**PURSUANT TO RULE 6(a) OF THE RULES GOVERNING § 2255 PROCEEDINGS**

Petitioner Bashiru Ganiyu, appearing pro se, respectfully moves this Court under Rule 6(a) of the Rules Governing Section 2255 Proceedings for leave to conduct limited, specific discovery concerning the prosecution, cooperation, and sentencing of Samuel Boateng, the cooperating witness who testified against Petitioner at trial. In support of this motion, Petitioner states as follows.

## I. The Discovery Requested

1. Petitioner requests leave to serve on the Government a request for production limited to the following four categories of documents concerning Samuel Boateng:

(a) The docket sheet in any federal criminal case in which Samuel Boateng was charged, including the case number, the district, and the assigned judge;

(b) The charging instrument (indictment, superseding indictment, or information) in that case, and the transcript or written record of Boateng's guilty plea;

14740649.1.114-120

(c) Any sentencing submission filed by the Government or by Boateng in that case, and the transcript of any sentencing proceeding; and

(d) The judgment entered against Boateng, including the sentence imposed, any restitution or forfeiture ordered, and any motion filed under U.S.S.G. § 5K1.1 or Federal Rule of Criminal Procedure 35(b) and the disposition of any such motion.

2. Petitioner does not request Boateng's cooperation agreement itself, his proffer statements, any internal Government work product, or any material concerning any person other than Boateng. The request is confined to filings and proceedings that are ordinarily matters of public record.

**II. Legal Standard**

3. Rule 6(a) of the Rules Governing Section 2255 Proceedings provides: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."

4. In *Harris v. Nelson*, 394 U.S. 286 (1969), the Supreme Court held that although the Federal Rules of Civil Procedure do not automatically apply to habeas proceedings, a federal court has inherent authority to authorize discovery, and that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id.* at 299-300. The Court emphasized that habeas courts must have "the power of inquiry" necessary to dispose of the matter "as law and justice require." *Id.* at 291, 298-99.

5. In *Bracy v. Gramley*, 520 U.S. 899 (1997), the Supreme Court applied Rule 6(a) and confirmed the *Harris* standard: "[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . .

14740649.1.115-120

. entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id.* at 908-09 (quoting *Harris*, 394 U.S. at 300). The Court held at 904 that a habeas petitioner, "unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course," but that Rule 6(a)'s "good cause" standard is satisfied by specific, non-speculative allegations tied to a colorable claim. Notably, *Bracy* found good cause even though the petitioner's theory rested substantially on inference, because the requested discovery was targeted and the claim was not frivolous. *Id.* at 908-09.

6. The Second Circuit applies these principles directly. In *Drake v. Portuondo*, 321 F.3d 338, 345 -46 (2d Cir. 2003), the court held that a district court abused its discretion in denying discovery and a hearing where the petitioner's specific allegations, if developed, would entitle him to relief. Good cause exists where the petitioner "sets forth specific allegations that give the Court reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief."

7. Rule 6(b) requires that a request for discovery "be accompanied by a statement of the interrogatories or requests for admission and a list of the documents, if any, the party seeks to have produced." Paragraph 1 above supplies that statement.

## III. Good Cause Exists

### *A. The discovery is directly material to Ground Twelve*

8. Ground Twelve of Petitioner's memorandum asserts that trial counsel was ineffective in failing to argue unwarranted sentencing disparity under 18 U.S.C. § 3553(a)(6). That claim depends on a comparison between Petitioner's 156-month sentence and the sentences imposed on other participants in the same criminal enterprise.

14740649.1.116-120

9. Petitioner has been able to develop that comparison as to four such participants — Farouk Appiedu, Fred Asante, Celvin Freeman, and Lord Aning — because they were prosecuted together in *United States v. Appiedu*, No. 21-cr-00088 (JSR), on a public docket. That record establishes that Asante, whom the Government called "by far the most culpable defendant of anyone who has been charged in this case or any related cases," received 108 months, and that Freeman, convicted at trial on seven counts and found by the sentencing court to have lied repeatedly under oath, received 78 months, later reduced to 63 months.

10. Samuel Boateng is the missing comparator, and he is the most significant one. Boateng was not a peripheral figure. He testified that he was a "middleman" in the same enterprise; that the network he participated in moved on the order of $100 to $150 million over approximately nine years across some 3,000 transactions; that approximately 85 percent of that volume derived from romance scams; and that he personally added "one-hop money washers" to the network's structure. (Tr. 134-35, 195.) He further testified to bribing police officers and embassy personnel, to insurance-fraud arsons, and to other violent and corrupt conduct in Ghana.

11. Boateng testified that he had pleaded guilty pursuant to a cooperation agreement to conspiracy to commit wire fraud, wire fraud, conspiracy to commit money laundering, conspiracy to receive stolen property, and conspiracy to receive stolen money. (Tr. 134, 189.) Those are the same offenses of which Petitioner was convicted, plus substantive wire fraud.

12. If Boateng — a self-described architect of a $150 million fraud network, who admitted to conduct far exceeding anything alleged against Petitioner — received a sentence materially below 156 months, that fact is directly probative of the disparity Ground Twelve alleges and of the prejudice Petitioner suffered from counsel's failure to raise it. Conversely, if the Government

14740649.1.117-120

produces records showing otherwise, Petitioner will be able to evaluate the claim accordingly. Either way, the information bears directly on a claim already before the Court.

### *B. The request is specific, not a fishing expedition*

13. Petitioner does not seek broad or exploratory discovery. He seeks four categories of documents concerning one identified individual, all of which relate to a single, already-pleaded claim. He does not seek Boateng's proffer statements, his cooperation agreement, agent notes, or any Government work product. He does not seek discovery concerning any other witness.

14. The documents sought are, in the ordinary course, public judicial records. Petitioner seeks them from the Government only because, as set forth in the accompanying certification, he has been unable to locate any public record of a criminal case against Samuel Boateng despite a diligent search.

### *C. The Government is uniquely positioned to produce the records*

15. Boateng testified pursuant to a cooperation agreement with the United States Attorney's Office for the Southern District of New York — the same office that prosecuted Petitioner. That office necessarily possesses, or can readily obtain, the docket number and filings in Boateng's case. Production would impose minimal burden.

16. If Boateng's case is sealed in whole or in part, Petitioner respectfully requests in the alternative that the Court direct the Government to file the responsive materials under seal for *in camera* review, and to advise the Court and Petitioner of the sentence imposed and any cooperation departure granted. Petitioner does not seek to unseal any matter the Court determines should remain sealed; he seeks only the disparity-relevant facts.

14740649.1.118-120

## IV. The Requested Discovery Will Not Delay These Proceedings

17. The request is narrow and can be satisfied by the production of a small number of documents. It will not require depositions, interrogatories, or third-party subpoenas. Petitioner respectfully suggests that the Government be directed to respond within thirty days of any order granting this motion, and that the materials be made part of the record for purposes of any evidentiary hearing held under 28 U.S.C. § 2255(b).

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court grant leave under Rule 6(a) of the Rules Governing Section 2255 Proceedings to obtain the four categories of documents identified in paragraph 1, or in the alternative direct the Government to submit those materials for *in camera* review, and grant such other relief as the Court deems just and proper.

Dated: August 28, 2026

Respectfully submitted,

Bashiru Ganiyu, Pro Se
Reg. No. 69417-054
FCI Allenwood Low
P.O. Box 1000
White Deer, PA 17887

14740649.1.119-120

## CERTIFICATION OF GOOD-FAITH SEARCH FOR PUBLIC RECORDS

I, Bashiru Ganiyu, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Petitioner in this action. I am incarcerated at FCI Allenwood Low, Register No. 69417-054.

2. Samuel Boateng testified against me at my trial in April 2024. He testified that he had pleaded guilty, pursuant to a cooperation agreement with the Government, to conspiracy to commit wire fraud, wire fraud, conspiracy to commit money laundering, conspiracy to receive stolen property, and conspiracy to receive stolen money.

3. Before filing this motion, I made a good-faith effort to locate the public record of that criminal case. Using the electronic legal research resources available to inmates at FCI Allenwood Low, and with the assistance of other inmates familiar with those resources, I searched for any federal criminal case captioned *United States v. Samuel Boateng* or containing Samuel Boateng as a named defendant.

4. I also asked family members and acquaintances outside the institution to search publicly available websites and free case-law and docket resources for any record of a federal criminal case against Samuel Boateng in the Southern District of New York or in any other federal district.

5. Despite these efforts, **I have found no record of any criminal case ever having been filed against Samuel Boateng**, notwithstanding his sworn testimony at my trial that he pleaded guilty to five federal felonies pursuant to a cooperation agreement.

6. I do not know the reason for this. It is possible that the case is sealed, that it was filed under a

14740649.1.120-120

different name or spelling, or that my search was inadequate given the limited resources available to me in prison. I state only what my search revealed.

7. Because I have been unable to locate these records through public sources, I am asking the Court for leave to obtain them from the Government, which necessarily knows the docket number of the case in which its own cooperating witness pleaded guilty.

8. I am not seeking these records to harass Mr. Boateng or for any purpose unrelated to this proceeding. I seek them solely to establish the comparison set forth in Ground Twelve of my memorandum of law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 28, 2026, at White Deer, Pennsylvania.

Bashiru Ganiyu
Reg. No. 69417-054

## CERTIFICATE OF COMPLIANCE REGARDING PRE-MOTION CONFERRAL

Petitioner respectfully submits this certificate regarding any requirement that a moving party confer with the opposing party before filing a discovery motion.

1. Petitioner is incarcerated at FCI Allenwood Low and is proceeding pro se. He has no telephone or electronic mail access to counsel for the Government, and his correspondence is

14740649.1.121-120

subject to institutional processing that makes timely pre-motion conferral impracticable.

2. In addition, as of the filing of this motion, the Government has not yet appeared in this collateral proceeding, no Assistant United States Attorney has been assigned to respond to Petitioner's § 2255 motion, and no order to answer has issued under Rule 4(b) of the Rules Governing Section 2255 Proceedings. There is accordingly no counsel of record with whom Petitioner could confer.

3. For these reasons, Petitioner certifies that he has been unable, in good faith, to confer with the Government before filing this motion, and respectfully asks that any conferral requirement be excused.

4. Petitioner further certifies that **he would be entirely amenable to withdrawing this motion** if the Government voluntarily provides the four categories of documents identified in paragraph 1 of the motion, or provides the docket number of Samuel Boateng's criminal case so that Petitioner may obtain the records himself. Petitioner has no desire to burden the Court with a contested discovery motion if the matter can be resolved by agreement.

5. Petitioner respectfully requests that, upon receipt of this motion, the Court direct the Government to advise whether it will produce the requested materials voluntarily.

Dated: August 28, 2026

Bashiru Ganiyu, Pro Se
Reg. No. 69417-054
FCI Allenwood Low
P.O. Box 1000
White Deer, PA 17887